Evan Lee **DEAKLE, Jr.,**
Plaintiff-Appellee,

v.

**JOHN E. GRAHAM & SONS, a corp.;
M/V Clara G., her engines, hull, tackle,
cargo and appurtenances thereof, De-
fendants-Appellants.**

No. 84–7244.

United States Court of Appeals,
Eleventh Circuit.

March 29, 1985.

Rehearing and Rehearing En Banc
Denied May 20, 1985.

**824**

Robert H. Smith, Mobile, Ala., for defendants-appellants.

* Honorable Seybourn H. Lynne, U.S. District Judge for the Northern District of Alabama,

James E. Atchison, William B. Jackson II, Mobile, Ala., for plaintiff-appellee.

Before JOHNSON and HATCHETT, Circuit Judges, and LYNNE *, District Judge.

JOHNSON, Circuit Judge:

Appellee Evan Lee Deakle, Jr., brought this action against his former employer, appellant John E. Graham & Sons ("Graham"), seeking to recover for the personal injuries he sustained while captaining one of Graham's vessels. Deakle alleged that the vessel was unseaworthy due to the presence on the crew of a dangerous seaman who unexpectedly and without provocation assaulted him. Deakle also alleged that Graham was negligent in hiring the assailant. The district court granted Deakle a directed verdict on the issue of unseaworthiness, and the jury found Graham negligent. Damages were assessed at $450,000, of which $400,000 represented lost future wages. In this appeal, Graham challenges the directed verdict and the finding of negligence. Graham also seeks a remittitur of the award for lost future wages. We affirm the district court's ruling as to Graham's liability but remand with directions for conditional remittitur of the damage award.

## I. FACTS

In the two years preceding his injury, Deakle worked short and sporadic stints for several companies, including Graham. Licensed to captain 100-ton vessels, he had experience aboard shrimp boats and vessels that served the offshore oil industry. Deakle had been with Graham only a few months when, on August 19, 1980, a berserk deckhand stabbed him in the back while he was piloting one of Graham's vessels. The attack was sudden and unprovoked.

sitting by designation.

Despite the seriousness of Deakle's injuries, he was hospitalized for only twelve days. His physicians testified that he was ready to return to work six weeks after being injured and that he had not been permanently disabled. Near the end of October 1980, Deakle resumed his captain's duties. One week later, however, he requested to be relieved. Deakle testified that as a result of the attack he no longer had the mental stability and confidence needed to assume the responsibilities of captain.

Graham gave Deakle a temporary job in its warehouse for the remainder of 1980, though it paid him as if he were on a full captain's salary of $21,560 per year. At the end of December, Graham offered to make the warehouse job a permanent position for Deakle if he would accept an annual salary of $13,780. This was slightly more than other workers in the warehouse were being paid but substantially less than what Deakle would have earned as a full-time captain. Under the terms of the offer, Deakle could return to his captain's duties at full salary whenever he felt ready. Deakle rejected the offer and brought this lawsuit.

The jury initially returned an unapportioned verdict assessing Deakle's damages at $450,000. The district court had the jury resume deliberations in order to assign a specific value to Deakle's lost future wages, i.e. earnings lost in years subsequent to the date of trial. The remainder of the verdict would comprise damages for pain and suffering, mental anguish, maintenance and cure, and lost past wages, the latter representing earnings lost during the period between the stabbing incident and the date of trial. After the jury denoted $400,000 of the verdict as lost future wages, the clerk of the court discounted this amount to present value at the date of trial, utilizing a two-percent below market discount rate as stipulated by the parties. The clerk then added back in the remaining $50,000 of the verdict, and the court awarded prejudgment interest on the entire sum at a rate of nine percent for the period between Deakle's injury and the date of trial. The final judgment totalled $439,197 and included over $105,000 in prejudgment interest.

In 1979, the year before he was injured, Deakle had earned $12,150. His income for 1980, including his earnings as captain and warehouse employee at Graham, totalled $11,468. In 1981, Deakle earned only $5,044, but in 1982 and 1983 his income was $15,142 and $19,141 respectively. Thus, with the exception of the year immediately following his injuries, 1981, Deakle has earned more money in each year since his injuries than he earned in either 1979 or 1980.

## II. DISCUSSION

### A. Liability: The Unseaworthiness Doctrine.

Graham first contends that the district court erred in granting Deakle's motion for a directed verdict on the unseaworthiness claim. In reviewing the lower court's decision to grant this motion, we must view the evidence as a whole in a light most favorable to Graham. From this perspective, the directed verdict can be affirmed only if the facts and inferences point so strongly in Deakle's favor that reasonable persons could only arrive at one conclusion, the conclusion that Graham's vessel was not seaworthy. *E.g., Bickford v. International Speedway Corp.*, 654 F.2d 1028, 1031 (5th Cir.1981) (Unit B).

■ Under well-established maritime law, Graham has an absolute, nondelegable duty to ensure that its vessels are seaworthy. This duty encompasses the obligation to provide a competent crew for each vessel, a crew composed of seamen of equal temperament, disposition, and seamanship to ordinary men in the calling. *E.g., Clevenger v. Star Fish & Oyster Co.*, 325 F.2d 397, 399–402 (5th Cir.1963). Precedent in this Circuit holds that an unprovoked, sudden, and unusually savage assault by one seaman against another constitutes, as a matter of law, a breach of the owner's duty to provide a seaworthy vessel. *Claborn v.*

*Star Fish Oyster Co.,* 578 F.2d 983, 985–87 (5th Cir.1978). Whether the owner knew or should have known of the assailant's dangerous propensities does not affect the determination of liability under the unseaworthiness standard, for the owner's duties are not conditioned on notice or fault. *Id.* at 985; *Clevenger, supra,* 325 F.2d at 400.

█ In this case, the jury could only have found that Deakle received his injuries as a result of a sudden, savage, and unprovoked assault by a member of the crew. Indeed, Graham did not attempt to controvert the facts surrounding the attack on Deakle. Graham argued instead that liability should not be imposed under the unseaworthiness doctrine precisely because the attack resulted from the assailant's sudden and unexpected onset of mental illness. Graham based this argument on a passage found in an old Fifth Circuit decision, *Holmes v. Mississippi Shipping Co.,* 301 F.2d 474, 477–78 (5th Cir.1962).

The passage from *Holmes* does not control the disposition of this case. The Court in *Holmes* refused to permit the plaintiff to recover for *self*-inflicted injuries, reasoning that no precedent supported such a recovery and persuasive policy arguments militated against the plaintiff's claim. Before reaching this holding, however, the panel majority expressed in dicta a doubt as to whether the plaintiff's sudden and unexpected onset of mental illness would have rendered the ship unseaworthy had he disfigured a fellow crewman instead of himself. This is the passage Graham cites in support of limiting the unseaworthiness doctrine to foreseeable assaults. By contrast, Judge Rives specially concurred in *Holmes* in order to make clear that he did not share the majority's doubt: "It is no barrier to recovery ... that Holmes' mental illness came on suddenly and without warning to the shipowner or to himself." *Id.* at 480. Moreover, apart from the status of the *Holmes* passage as dicta, that decision preceded *Clevenger* and *Claborn,* both of which involved assaults characterized as "sudden" and "without word or warning." *Clevenger, supra,* 325 F.2d at

398; *Claborn, supra,* 578 F.2d at 987. The most recent precedent is preferred.

Limiting the unseaworthiness doctrine as Graham suggests would, in effect, reintroduce principles of notice and fault into this area of admiralty law. It would contravene binding precedent in this Circuit. Such a ruling is beyond the power and predilections of the present panel. We therefore affirm the district court's holding as a matter of law that the assailant's temperament and disposition fell below the standards of ordinary seamanship. Having affirmed Graham's liability under the unseaworthiness doctrine, we need not address Graham's challenge to the jury's finding of negligence. *Claborn, supra,* 578 F.2d at 987.

### B. Damages: Lost Future Wages.

Graham also challenges the valuation of Deakle's damages. Initially, Graham questions the sufficiency of the evidence supporting both the jury's finding that Deakle's future earning capacity has been permanently diminished and the jury's assessment of this loss at $400,000. Graham further alleges that the clerk of the district court erred in discounting the award to present value. Finally, Graham challenges the district court's decision to add prejudgment interest to the entire verdict at the rate of nine percent. We shall discuss each of these issues in sequence.

█ 1. *Sufficiency of the Evidence: Deakle's Permanently Diminished Earning Capacity.* The extent of Deakle's injuries and their debilitating effect on his future earning capacity were hotly disputed issues at trial. Both physicians who examined and treated Deakle testified that his physical injuries were not so serious as to prevent him from returning to his captain's position within six weeks of the stabbing incident, even though he might suffer some pain and discomfort indefinitely. Similarly, one psychiatrist stated that Deakle's suffering from anxiety did not render him unfit for captain's duty. However, a second psychiatrist (Dr. Brown) agreed with Deakle's psychologist (Dr. Rosen), who had

previously diagnosed Deakle as having an adjustment disorder with mixed emotional features. Doctors Brown and Rosen stated that in their opinion Deakle's psychological impairment was permanent. Their testimony, however, was not without equivocation, and the degree to which Deakle's impairment might magnify in the future was admittedly unknown.[1]

In reviewing the sufficiency of the evidence supporting a jury's verdict, we must determine "whether the state of the proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." *American Casualty Co. v. Myrick*, 304 F.2d 179, 182 (5th Cir.1962). It is the jury's function to weigh the evidence and the credibility of the witnesses, and the jury's verdict should not be disturbed if there is competent evidence in the record to support it. *Torrence v. Union Barge Line Corp.*, 408 F.2d 873, 875 (5th Cir.1969). Here, the jury could have believed Doctors Brown and Rosen and could have reasonably concluded that Deakle will never be able to return to his former occupation. Thus, while we acknowledge the conflicting and somewhat equivocal nature of the expert testimony, we affirm the jury's verdict as to the permanence of Deakle's mental condition. *Cf. Lawrence v. Gulf Oil Corp.*, 375 F.2d 427,

430 (3d Cir.1967) (upholding a jury's finding of permanent occupational disability under analogous facts where, although the record was devoid of any specific testimony as to the permanence of the plaintiff's injuries, *all* doctors agreed that he was disabled from going to sea at the time of trial and his medical prognosis was, at best, "problematical").

■■ 2. *Sufficiency of the Evidence: The Measure of Deakle's Recovery.* Our affirmance of the jury's finding of a permanent psychological impairment does not encompass the separate issue of whether the evidence is sufficient to support the measure of damages the jury awarded for this impairment. Graham avers that the $400,000 award for lost future wages is excessive, especially in light of Deakle's substantial post-injury earnings. Yet the fact that these earnings have been substantial is not alone controlling. *See Lawrence, supra,* 375 F.2d at 430. Rather, a careful and detailed comparison of Deakle's income before and after the stabbing incident is necessary. As must a trial court in considering a motion for remittitur, in an appeal from the denial of such a motion we must independently determine the maximum possible award that is reasonably supported by the evidence in the record. Any excess must be remitted. Alternatively, a new

---

1. Dr. Rosen testified:

The impact of the injury and subsequent loss of his occupation in turn has had a feedback effect and serves to intensify the effects of the original stressor. Mr. Deakle shows this impairment by a combination of depression and anxiety, showing such symptoms as a depressed mood, feelings of hopelessness, nervousness, worry and jitteriness.

On the basis of this evaluation, Mr. Deakle is currently impaired substantially in his ability to resume the responsibility of his former occupation. He may eventually recover to the point of regaining or reestablishing the personality adjustment necessary for his former functioning. The rate or degree of eventual recovery, however, is dependent on a myriad of factors and circumstances.

It appears probable that he will never readjust to the original pretraumatic personality....

．　　．　　．　　．　　．

I think that [his condition] is permanent, that I doubt at this point that he will ever regain his former competence....

Dr. Brown testified by reading from a prior written report:

[Deakle] is not incapacitated, obviously, but his life is certainly poorer and is apt to remain so in a considerable degree. Also his neurosis may well, as is often the case, magnify its manifestations to even greater incapacitation.

When asked at trial about the permanence of Deakle's condition, Dr. Brown stated:

It's very difficult to say. The probabilities are that without proper treatment he will sustain some kind of defect. The degree of which is impossible to say. In other words, there would be a continuation of some of his symptoms or, as I mentioned in the last sentence in my report, often it is the case that such emotional symptoms magnify over a period of time. The difficulties that they cause, if these difficulties are not treated, tends [sic] to radiate into other difficulties.

trial may be granted. *Jenkins v. Aquatic Contractors & Engineers,* 446 F.2d 520, 522 (5th Cir.1971).

■ Deakle attempts to show that the $400,000 award is less than the maximum possible award supported by the evidence. He derives this maximum by first dismissing as immaterial his $12,150 earnings in 1979, claiming that he had intended to work only for Graham beginning in the summer of 1980 and thus his earnings would have been steady from then on. Deakle next estimates what his annual salary as a captain for Graham would have been: $21,560. Deakle then compares this estimate to his earnings during the *least* remunerative of the three years since his injuries, $5,044 in 1981, thereby avoiding any consideration of his $15,142 income in 1982 and $19,141 income in 1983. The difference, ($21,560 − $5,044 = $16,516), is multiplied times Deakle's remaining life expectancy of 44 years to reach a minimum of $726,704, which is well above the $400,000 awarded by the jury. As an alternative, Deakle *averages* his earnings for 1981 through 1983, compares this average with the $21,560 estimated captain's salary, multiplies the difference times his life expectancy, and claims to reach a figure "very close" to $400,000.

In response, Graham relies on this Court's decision in *Howell v. Marmpegaso Compania Naviera,* 536 F.2d 1032 (5th Cir.1976), which reversed an unapportioned $150,000 jury award with directions that it be remitted "to the outer limits of the proof" or, at the option of plaintiff Howell, that a new trial be granted. Before being injured in November 1967, Howell had earned $8,590 that year as a longshoreman. The Court calculated that, if Howell had worked the entire year at this rate, he would have earned an annual salary of $9,800. This was the only basis in the record for projecting his earnings as a longshoreman. In 1968 Howell earned $10,392 working at a number of jobs, in-

cluding cab driver. This was more than he would have earned had he remained a longshoreman. In 1969 Howell had back surgery necessitated by his prior injury and earned only $1,368. The following year Howell earned $8,021, and in 1971 he worked a full year as a furniture salesman and earned $16,965, again surpassing his projected salary as a longshoreman. In 1972 Howell's earnings reached $19,000. After comparing these figures to Howell's projected salary as a longshoreman, the Court concluded that he had suffered only a moderate loss of *past* wages. The Court appraised these lost wages at less than $9,000 in 1969 and less than $2,000 in 1970. His proven medical expenses were slightly more than $3,000, and so the Court held that only about $14,000 in "hard damages" had been established by the evidence. The unapportioned jury verdict of $150,000 was for "medical expense, loss of wages, pain and loss of earning capacity," the latter being synonymous with lost *future* wages. Having concluded that the proven medical expenses and lost past wages totalled approximately $14,000, the remaining $136,000 represented "the more speculative damage elements of past and future pain and loss of earning capacity." *Id.* at 1034. The Court held this amount "simply not in the universe of rational awards on the evidence in this record." *Id.* Further, the *Howell* Court found "no basis in the record for projecting any future wage loss." *Id.* Since Howell's pre-injury earnings as reflected in his projected longshoreman's salary would also be a proper basis for calculating lost wages in the years after the trial,[2] the *Howell* Court's inability to find any future lost wages must have resulted from an absence of evidence that Howell's future earnings would again drop below his pre-injury earnings.

The Supreme Court of the United States has strongly suggested that the distinction followed in *Howell* between lost past wages and lost future wages should be

---

**2.** We base this assertion on the fact that the date of a trial does not affect a plaintiff's future earning capacity.

abandoned. The distinction can lead to imprecise awards when lost earnings are discounted to present value, a subject we shall address in a subsequent portion of this opinion. The Supreme Court would have litigants focus exclusively on the date of injury and thus define every diminution in earning capacity as lost future wages. *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 538 n. 22, 103 S.Ct. 2541, 2551 n. 22, 76 L.Ed.2d 768, 784 n. 22 (1983). Nevertheless, we encounter in this appeal a trial record in which the litigants and the district court maintained the distinction throughout the proceedings below. Therefore, out of necessity, our discussion shall diverge at times from the ideal and treat past and future lost wages separately. Moreover, although the dichotomous approach followed in *Howell* is no longer preferred, the analysis of that decision is not wholly without merit.

 One principle to be gleaned from *Howell* is that a plaintiff's pre-injury earnings provide a basis for measuring his lost past wages. In this case, were we to use Deakle's $12,150 income in 1979 as a basis, we would conclude that he suffered, at most, a relatively small loss of past wages: $7,106 during 1981. That was the only year in which his income fell below $12,-150.[3] However, the record contains testimony establishing that, as a captain for Graham, Deakle was being paid at a substantially higher rate during the few months immediately preceding his injuries. The record also contains testimony supporting Deakle's avowed intention before the stabbing incident to remain permanently in Graham's employ as a captain. Despite Deakle's sporadic work pattern in the past, the jury could have believed this testimony

and reasonably found that, but for the attack, Deakle would have continued to occupy a captain's position and earn a captain's salary. This salary, however, comprises the maximum possible basis for calculating lost wages that is reasonably supported by the evidence introduced below. The record is devoid of any additional evidence reliably establishing that Deakle would have earned a greater salary.[4]

 Graham does not dispute that the annual captain's salary projected from Deakle's pre-injury earnings is $21,560. Using this figure as a basis, we calculate Deakle's lost earnings during 1981, 1982, and 1983 as $16,516, $6,418, and $2,419 respectively. Totalling these figures, we reach the maximum possible recovery for lost past wages: $25,353. In accordance with the district court's instructions to the jury, this amount was included in the unapportioned $50,000 component of the verdict, which represents total damages for pain and suffering, mental anguish, maintenance and cure, and lost past wages. Graham does not challenge the award for pain and suffering, mental anguish, and maintenance and cure. Since we have no evidence before us that the jurors in fact awarded Deakle more than $25,353 for lost past wages, along with a concomitant reduction for the other elements of damages within the $50,000 determination, we cannot hold that this component of the verdict includes an excessive measure of Deakle's diminished earning capacity in the three years between the stabbing incident and the date of trial.

 The analysis in *Howell* also supports utilizing the $21,560 projected captain's salary as a basis for measuring

---

**3.** Deakle can claim no loss of earnings in 1980, since he was kept on full captain's salary until the end of the year.

**4.** Deakle claims that his captain's salary would have increased over time as a result of foreseeable raises to all of Graham's employees and, further, that a sizeable salary increase would have accompanied his achieving the alleged goal of obtaining a license to captain 300-ton vessels. Particularized events such as these might well

have increased Deakle's earnings had he not been injured, but the evidence in the record fails to establish with any degree of precision the actual monetary gains that would have resulted. The jury could only have been speculating if it attempted to incorporate these claimed increases into Deakle's projected captain's salary. A damage award based on such conjecture would not be reasonably supported by the evidence in the record.

Deakle's lost future wages.[5] The Supreme Court's suggested abandonment of the distinction between past and future lost wages reinforces the propriety of taking such an approach. The goal is to replicate as accurately as possible, in annual installments,[6] the injured plaintiff's lost stream of future income. *Pfeifer, supra,* 462 U.S. at 533–38, 103 S.Ct. at 2548–51, 76 L. Ed.2d at 780–84; *Culver v. Slater Boat Co.,* 722 F.2d 114, 117–18 (5th Cir.1983) (en banc).[7] This lost stream of income is composed of the yearly differences between what Deakle would have earned had he not been injured and what his forecasted actual earnings will be, given his injuries. The factfinder must carefully estimate these two streams of income before making the necessary subtraction.

■ The projected captain's salary of $21,560 provides the starting point for calculating what Deakle would have earned, but for his injuries, in each year following the stabbing incident. To these annual sums, the factfinder ideally makes a number of adjustments. Initially, each installment of the projected salary should be increased to reflect in the respective year any increase in salary the uninjured Deakle would have obtained as a result of promotions, seniority, "merit raises," and the like. *Pfeifer, supra,* 462 U.S. at 535, 103 S.Ct. at 2549, 76 L.Ed.2d at 782. These pay increases must be reliably demonstrated at trial, and we fail to find sufficient evidence in the record before us to support adjusting

the projected annual salary on this account.[8]

■ To each installment should next be added, in the years they would have accrued, the fair market value of any fringe benefits that the uninjured Deakle would have received had he remained employed as one of Graham's captains. Examples of these fringe benefits include employer-paid health and life insurance coverage. *Pfeifer, supra,* 462 U.S. at 534 n. 12, 103 S.Ct. at 2549, 76 L.Ed.2d at 781 n. 12. Here again, however, we can find no evidence in the record of any fringe benefits that will inure to Graham's employees in the future.

■ The unreimbursed business expenses that the uninjured Deakle would have incurred should then be subtracted from the relevant projected annual installments. These expenses include, for instance, work-related transportation costs and the cost of uniforms. *Pfeifer, supra,* 462 U.S. at 534, 103 S.Ct. at 2549, 76 L.Ed.2d at 781. Once more, however, the record in this case was insufficiently developed at trial to permit us to make any business expense adjustments.

■ Finally, the income taxes that the uninjured Deakle would have paid should be subtracted from each respective annual installment of his projected income.[9] *Id.* However, because the evidence introduced at trial did not establish how much in taxes an uninjured Deakle would have paid, we cannot adjust Deakle's projected salary installments in this manner.[10] The effect

---

5. *See supra* note 2 and accompanying text.

6. The lost stream of income is computed as a series of *annual* installments out of convenience. *See Pfeifer,* 462 U.S. at 534 n. 11, 103 S.Ct. at 2549 n. 11, 76 L.Ed.2d at 781 n. 11.

7. *Culver* is binding precedent in the Eleventh Circuit. *See Culver,* 722 F.2d at 123 n. 1 (dissenting opinion). In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981), we held that panel decisions of the former Fifth Circuit rendered prior to September 30, 1981, are binding precedent in our Circuit. Footnote 1 of the dissenting opinion in *Culver* mistakenly states that the controlling date is September 30, 1983.

8. *See supra* note 4 and accompanying text.

9. The amount of each deduction will be derived by applying the tax rates that the factfinder concludes would be found in the tax tables printed for each future year. This is admittedly a matter of some conjecture, and the projected tax rates should be reasonably predicated upon testimony or other evidence introduced at trial. Of course, litigants can stipulate in advance to projected future tax rates for the salaries they consider to be within the foreseeable realm of proof.

10. Although not endorsed by the Supreme Court in *Pfeifer,* 462 U.S. 534, 103 S.Ct. at 2549, 76 L.Ed.2d at 781, the use of *pre-tax* projected incomes is preferred as a matter of economic efficiency. Employing *after-tax* figures bestows on the defendant a gratuitous reduction in the

of this limitation is to increase Deakle's recovery, since the entire $21,560 of the projected annual salary will be used as the basis for computing his lost future income. Having failed to perfect the record at trial, Graham cannot complain on appeal that an error has been made.

■■■■ After determining the annualized stream of income that an uninjured Deakle would have earned and making the necessary adjustments to each installment, the factfinder ideally would employ the same procedures to derive a similar forecast of what Deakle's *actual* earnings will be, given his injuries.[11] We cannot now know exactly what the jury concluded were Deakle's expected earnings, given his impaired mental condition, but we can look to his proven post-injury earnings for a figure below which the jury could not have reasonably chosen amounts intended to represent his expected annual salary installments, absent reliable evidence that Deakle's mental condition will deteriorate. This figure is $19,141, an annual salary we know Deakle is at least capable of earning at the time of trial, since he earned precisely this amount in 1983. We can safely presume that the injured Deakle will earn, at a minimum, $19,141 in each year after trial. Again, however, we cannot adjust this predicted annual income to account for expected salary increases, fringe benefits, unreimbursed business expenses, or taxes,

because the parties did not sufficiently develop the evidence at trial.

■■■ At this point, a further adjustment would ordinarily be made to the annualized forecast of the injured Deakle's earnings to account for any changes in his future income that are expected to result from any improvements in or deterioration of his present mental condition. We can find in the testimony admitted at trial only two vague references to the possibility that Deakle's mental condition might deteriorate and thereby reduce his actual future earnings.[12] This testimony, however, was highly speculative, particularly in light of the increasing trend in Deakle's actual post-injury earnings. More importantly, the testimony does not consist of reliable, quantifiable evidence as to the degree to which Deakle's psychological prognosis may affect his future earnings. To attribute the magnitude of the jury's verdict in this case to such conjectural testimony would permit Deakle to recover an amount not reasonably supported by the evidence in the record. Thus, no further adjustment to the $19,141 expected annual income can be made.

After completing the steps described thus far and deriving two annualized streams of income, one for the theoretically uninjured Deakle and one for the existing

---

amount he would otherwise have paid the plaintiff had the latter not been injured. As a result, the incentive needed to ensure that the defendant takes the appropriate degree of safety precaution is not fully realized. We make this observation parenthetically, however, and we accept the post-tax model described in *Pfeifer* as the ideal, at least until the Supreme Court suggests otherwise.

11. We note that the deductions for taxes here will not be as great as they were in calculating what an uninjured Deakle would have earned. The injured Deakle's earnings will necessarily be less than the uninjured Deakle's earnings, or else no recovery could be had for this element of damages at all. Thus, even if the two sets of annualized income streams are taxed at the same rate, the measure of taxes will differ. Moreover, the injured Deakle's smaller earnings may place him in a lower marginal tax bracket. The disparate figures should still be used just as

if the two taxpayers were actually filing tax returns in the years in question. The larger hypothetical tax payments of the uninjured Deakle should not be subtracted from the forecasted earnings of the injured Deakle. To do so would defeat the ultimate goal of giving the injured Deakle the same *after*-tax income that he would have earned had he not been injured.

12. Dr. Rosen stated: "The impact of the injury and subsequent loss of his occupation in turn has had a feedback effect and serves to intensify the effects of the original stressor...." Dr. Brown testified: "[O]ften it is the case that such emotional symptoms magnify over a period of time. The difficulties that they cause, if these difficulties are not treated, tend to radiate into other difficulties." The ultimate conclusions of both witnesses, however, were at best ambiguous as to the degree to which Deakle's condition might worsen. *See supra* note 1.

injured Deakle, the factfinder would subtract the paired figures year by year to reach an annualized stream of lost income. Here, since the unadjusted $21,560 captain's salary has been used in each year to represent the uninjured Deakle's future income and the $19,141 figure has been used in each year to represent Deakle's expected actual income, the result of subtracting the figures is a constant stream of lost future income in the amount of $2,419 annually.

■ As a rule, Deakle's work-life expectancy would be used to determine the length of his stream of lost future income. *Id.* The record before us, however, does not contain evidence establishing the number of years that Deakle could have expected to work for Graham. Deakle did introduce a mortality table into evidence, and it apparently assigns the twenty-nine year old Deakle a life-expectancy of 44 years beyond the date of trial.[13] Nevertheless, Graham argues that Deakle's work-life expectancy was only 36 years as of the date of trial, and in the district court's final judgment the award for lost future wages is stated to have been discounted based on a work-life expectancy of thirty-six years, implying Deakle's retirement at age sixty-five. On appeal, Deakle has not challenged the 36-year discount below. This is not surprising since a 44-year discount would have substantially decreased his recovery. Yet, as we have previously related, Deakle's argument before this Court employs the 44-year life expectancy in an attempt to show that the jury verdict does not exceed the maximum possible recovery which is reasonably supported by the evidence. Al-

though it is not clear that the trial record contains a work-life expectancy table, we decline to alter the district court's conclusion that the jury presumed an uninjured Deakle would have retired at age sixty-five. Deakle's attorney suggested this approach to the jurors in closing argument,[14] and Deakle has not challenged the 36-year figure on appeal. Thus, the annualized stream of Deakle's lost future income extends for thirty-six years.

■ 3. *Discounting Lost Wages to Present Value and Adding Prejudgment Interest.* The annualized stream of lost future income must now be discounted to present value. The purpose and method of discounting damage awards for lost income have been fully set forth in *Pfeifer, supra,* 462 U.S. at 538–53, 103 S.Ct. at 2551–58, 76 L.Ed.2d at 784–93, and *Culver, supra,* 722 F.2d at 119–23, and we need not discuss these matters in great depth here. We simply note that this Circuit has chosen from among the methods currently available the approach which utilizes a below market discount rate. The rate represents the estimated market interest that Deakle will earn on the monies received after final judgment, adjusted for the effect of income taxes he will pay on the interest and then offset by the expected rate of general wage and price inflation.[15] *Culver, supra,* 722 F.2d at 118. The litigants in this appeal stipulated to a two-percent below market discount rate, and the rate is not at issue here. Nor is the general method by which the clerk of the district court applied the discount rate.[16]

13. Though introduced at trial, the mortality table was not included in the record sent to us on appeal. We rely on Deakle's brief for the accuracy of the 44.16 figure, which we have rounded down to a 44-year life expectancy.

14. In closing, counsel for Deakle argued:
Now, there's a set of things that's been introduced into evidence that's the mortality table. And it's important—it's the one—the last one that's official is 1980 and the Court accepted it into evidence and it shows at age twenty-nine Lee Deakle has a life expectancy of forty-four point sixteen years. But if employment is the question, I'd say up to sixty-

five, age sixty-five. If you just want to give the minimum thing of sixty-five, then you take that; that's thirty-six years.

15. The wage inflation incorporated here is "general" in the sense that it will affect all individuals of society. Particularized wage increases have already been accounted for in the claimant's projected salaries. *See supra* notes 4, 8, 11 and accompanying text.

16. We assume that the clerk divided the $400,-000 verdict by the 36 year work-life expectancy to reach a constant stream of $11,111 annual installments before separately applying the discount rate to each installment for the number of

Ideally, the stream of lost future income would begin with the date of Deakle's injuries, with no distinction being made between lost past wages and lost future wages. The next step would be to total the discounted installments and then add "interest" to the entire sum for the period between the date of injury and the date of trial. This "interest" is added to account for the fact that none of the already discounted annual installments which Deakle will receive has earned any interest during the years prior to trial. *Pfeifer, supra,* 462 U.S. at 538 n. 22, 103 S.Ct. at 2551 n. 22, 76 L.Ed.2d at 784 n. 22.[17] This adjustment, however, differs slightly from the addition of the prejudgment interest that district courts are authorized to award by statute. Choosing the rate to be applied in awarding statutory prejudgment interest is left to the discretion of the district court. *See In re Complaint of Bankers Trust Co.,* 658 F.2d 103, 112 (3d Cir.1981), *cert. denied,* 456 U.S. 961, 102 S.Ct. 2038, 72 L.Ed.2d 485 (1982); *Arco Pipeline Co. v. SS Trade Star,* 693 F.2d 280, 281 (3d Cir. 1982). Here, the court added interest at a rate of nine percent, yet the litigants agreed by stipulation that the effect of a year's delay in Deakle's receiving compensation for lost future income amounted to only a two-percent real loss. Symmetrical treatment should be given to the estimated lost earnings both before and after trial so that neither party can benefit by delaying the final judgment. Therefore, the already chosen below market discount rate should also be utilized when adjusting the award to account for the interest not earned between the dates of injury and trial. *Cf. Pfeifer, supra,* 462 U.S. at 538 n. 22, 103 S.Ct. at 2551 n. 22, 76 L.Ed.2d at 784 n. 22; *In re Air Crash Disaster Near Chicago, Ill.,* 644 F.2d 633, 644 n. 19 (7th Cir.1981).

We are not dealing with the ideal case here, however, since the distinction was made at trial between lost past wages and lost future wages. The proper disposition of this case becomes slightly more complicated as a result. Our first observation is that the district court erred in adding to the entire verdict statutory prejudgment interest at a rate of nine percent. This rate of interest should only have been added, if at all, to the portions of the verdict that do not represent lost past and future wages. We have already determined $25,353 to be the maximum possible award for lost past wages that is reasonably supported by the evidence in the record. Therefore, *at least* the remaining $24,647 of the unapportioned $50,000 component of the verdict represents Deakle's recovery for pain and suffering, mental anguish, and maintenance and cure. The award of statutory prejudgment interest on this amount did not constitute an abuse of the district court's discretion.

years between the date of trial and the year in which Deakle would have earned the installment had he not been injured. Thus, the first $11,111 installment was discounted for only one year, the second for two years, the third for three years, and so on. The thirty-six discounted installments were then presumably added to reach the sum finally awarded as lost future wages. By contrast, to have applied the two-percent discount rate to the entire $400,000 for thirty-six years would have been erroneous, since the goal was not to award Deakle an amount of money at the time of trial that, together with future interest, would have equalled $400,000 when Deakle turns sixty-five. Rather, the goal was to award a sum that, when invested, would have enabled Deakle to withdraw $11,111 each year until age sixty-five.

Of course, the ideal jury verdict will be structured so that the court will know the specific amounts found by the jury to represent the annual installments of lost future income. These amounts may not always be constant. The stream of lost income may increase or decrease due to the various factors previously discussed in this opinion. *See supra* notes 8–11 and accompanying text.

17. The Supreme Court in *Pfeifer* states that the plaintiff "may" be awarded this "interest," as if this step in calculating damages is governed by the same considerations that arise when a trial court decides to award statutory prejudgment interest. *Pfeifer, supra,* 462 U.S. at 538 n. 22, 103 S.Ct. at 2551 n.22, 76 L.Ed.2d at 784 n. 22. Yet, since the goal is "to ensure that the award when invested will still be able to replicate the lost stream," *id.,* we conclude that "awarding" this "interest" should be the norm, though as discussed in the text of this opinion the rate applied should be the equivalent of the below market rate used in discounting the stream of lost income to present value.

As for lost *future* wages, the clerk of the court need only discount the thirty-six annual installments to the date of trial before totalling the award. The clerk could discount back to the date of Deakle's injuries, total the award, and then add back in the "interest" not earned in the years before trial. But this would entail unnecessary effort, since the latter adjustment would employ the same rate as the discount rate that had already been applied to each installment for the same period.

Concerning lost *past* wages, no discounting should be applied at all. It is merely necessary to adjust separately each year's installment to account for the delay experienced before trial.[18] The below market discount rate equivalent should also be employed when making this adjustment.

In sum, we hold that the evidence presented in this case will reasonably support, at most, the following award: $24,647 for pain and suffering, mental anguish, and maintenance and cure, plus nine-percent prejudgment interest from the date of Deakle's injuries to the date of trial; $25,353 for lost past wages, plus two-percent annual "interest" for the years spent awaiting trial;[19] and $2,419 times thirty-six years as lost future wages, each installment to be discounted to its present value as of the date of trial, with no addition of "interest" to be made. On remand, the district court is directed to require a remittitur to this extent, or, at Deakle's option, to grant a new trial on the question of damages. *See Natco, Inc. v. Williams Bros. Engineering Co.*, 489 F.2d 639, 641 (5th Cir.1974).

All too often appellate courts are saddled with the task of correcting mistakes in damage awards caused by inattentive litigants at trial. After the jury returns a verdict, it is too late to consider how the damages should have been calculated and proved. By then, the horse is out of the barn. Therefore, it would behoove future litigants when preparing for trial to study carefully the horizon of damages before heading off down the trail. This advice is particularly apt where, as in this case, the trial court has already directed a verdict on the issue of liability. The record at trial must be fully developed on the issue of damages, and the jury verdict should be apportioned in meaningful detail. Relying on an appellate court to sort through the record and calculate the appropriate damages merely delays achieving a just and reasonably accurate final judgment.

The judgment of the district court is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

---

18. In making these adjustments, the two-percent "interest" added to each annual installment should not run from the date of Deakle's injuries, but rather from the year in which the sums accrued. Thus, the "interest" begins running on Deakle's $16,516 loss in 1981 as of the end of that year. The $6,418 loss in 1982 earns "interest" starting at the end of 1982, and the $2,419 loss in 1983 earns interest only for the relatively short period between December 31, 1983, and the date of trial. *See In re Air Crash Disaster*, 644 F.2d at 644 n. 19.

19. *See supra* note 18.