594 So.2d 900 (1991)
J.W. O'BRYAN
v.
FOLK CONSTRUCTION COMPANY.
No. 91-CA-0380.
Court of Appeal of Louisiana, Fourth Circuit.
November 14, 1991.
On Rehearing Granted February 13, 1992.
*902 Carl J. Barbier, Barbier & Cumberland, New Orleans, and Terry A. Bell, The Bell Law Firm, Belle Chasse, for plaintiff/appellee.
Wilton E. Bland, III, Peirce A. Hammond, II, Hebert, Mouledoux & Bland, New Orleans, for defendant/appellant.
Before SCHOTT, C.J., and LOBRANO and WILLIAMS, JJ.
SCHOTT, Chief Judge.
Claiming to be a seaman, plaintiff, J.W. O'Bryan, instituted this suit against his employer, Folk Construction Company, for damages based upon negligence under the Jones Act, 46 U.S.C.App. § 688, and unseaworthiness under the General Maritime Law of the United States. Fidelity and Casualty Company, Folk's worker's compensation insurer, intervened to recover compensation benefits and medical expenses it paid to and on behalf of plaintiff. Following a bench trial the court rendered judgment in plaintiff's favor for $364,783 and in favor of the intervenor for $43,055. Folk has appealed. The principal issue is whether the trial court erred in determining that plaintiff occupied the status of a seaman. Also, at issue are factual and legal questions regarding Folk's negligence, plaintiff's contributory negligence, the extent of plaintiff's disability, plaintiff's entitlement to awards for lost earnings, future medical expenses and maintenance; the proper method of computing interest on the judgment, and the validity of the judgment in favor of the intervenor.
Plaintiff was employed on September 11, 1988 as a "shoreman" in connection with a dredging contract Folk had with the U.S. Army Corps of Engineers to pump fill from the Mississippi River to an area behind a rock levee on the river bank. Folk was operating two dredging vessels on the project, the CATHY M and the TENNTOM. A pipeline extended from the CATHY M over the levee into the "dump" area. Plaintiff's principal duty was to maintain the pipeline on the shore by plugging leaks in segments of the pipeline, moving the line about, and adding segments of pipe as needed. He worked in conjunction with Ed Jackson who operated a bulldozer to spread the fill. The men also laid down sheets of visquene on the rock levee to prevent the fill from seeping back into the river. Located on the land was a shack where the shoremen kept their tools and equipment.
Each day plaintiff reported for work on the CATHY M after being transported there by crewboat. The captain of the dredge was his supervisor. The dredge had a regular crew of seamen including an engineer and deckhands. Although plaintiff's principal duties were with the pipeline on shore, he performed some duties on the dredge such as repairing the pump. Hotly contested at trial was the extent of time plaintiff spent working on the dredge. He testified that he spent fifty percent of his *903 time on the dredge, frequently performing the tasks of a deckhand, and this was corroborated by the testimony of his captain. Folk points to inconsistencies between their testimony at trial and at depositions and argues that this fifty percent estimate was fabricated and exaggerated to support plaintiff's claim to a seaman's status. The trial court found that plaintiff performed various duties as a deckhand aboard the dredge while it was in operation and these duties were performed on a regular and routine basis. While Folk's argument attacking the credibility of plaintiff and his captain is not altogether without merit, we must defer to the trial court in its evaluation of the credibility of the witnesses. We cannot say the trial court's findings in this regard are clearly wrong.
Even so, we do not attach great significance to the percentage of time plaintiff spent on the dredge as opposed to the shore in determining his status as a seaman. In order for plaintiff to prove he was a seaman he had to prove (1) he was assigned permanently to a vessel or performed a substantial part of his work on the vessel; and (2) his work duties contributed to the function of the vessel or to the accomplishment of its mission. Offshore Company v. Robison, 266 F.2d 769, 779 (5th Cir.1959).
In deciding whether plaintiff meets this test we must consider the nature of the vessel involved here. It was engaged in removing fill from the river to the bank. Essential to this operation was the pipeline carrying the material from the ship to the shore. Unless the pipeline was maintained and moved about on the shore the operation would break down and the whole purpose for the dredge would be defeated. Plaintiff was permanently assigned to the dredge, reporting for duty and getting his instructions there, and working with a pipeline that was an integral part of the dredge. His duties on shore obviously contributed to the function of the dredge and the accomplishment of its mission. Considering the nature of this kind of vessel, he was as much a member of the crew as the regular deckhands. Consequently, we find no error in the trial court's conclusion that plaintiff was a seaman entitled to claim the benefits of the Jones Act.
Folk next takes issue with the trial court's findings of negligence on its part and no contributory negligence on plaintiff's part. The trial judge found that defendant had plaintiff and Jackson laying down the visquene at night when this task was normally accomplished during the day by four workers. The trial judge found that the lighting Folk provided for the job was inadequate. There was conflicting evidence as to the amount of light provided and whether it was adequate for safety purposes. The evidence showed that there was a battery powered portable set of floodlights illuminating the area along with the lights from the bulldozer, but such a factual finding will not be disturbed on review. The judge concluded that Folk was negligent in failing to provide plaintiff with a safe place to work and with the necessary amount of assistance to perform his duties. In a Jones Act case a seaman's burden of proof is "feather-weight". He need prove only slight negligence "which can be accomplished by very little evidence." Miles v. Melrose, 882 F.2d 976, 984 (5th Cir.1989). When this standard is applied we can hardly say the trial court erred in finding that plaintiff carried his burden of proving Folk's negligence.
As to contributory negligence, Folk contends that the trial court erred in failing to find that plaintiff was derelict in failing to use his flashlight to see where he was going. This argument is specious. Plaintiff could not hold a flashlight while performing the task at hand, and even if he had this would not have prevented the accident which was a natural outgrowth of the dangerous environment where he was ordered to work.
Next, we turn to the award itself with which Folk takes serious issue. The trial court included the following amounts in the judgment:

Past Lost Income $ 48,972.00
Future Lost Income 106,596.00
Future Medical Expenses 10,000.00
Maintenance ($38 per day) 24,831.00
Cure 24,384.00
General Damages 150,000.00
 ___________
 Total $364,783.00

*904 The court awarded interest on this entire amount from the date of the accident until paid and ordered that Folk continue paying maintenance at $38 per day until such time as plaintiff reaches maximum medical cure. Finally, the court awarded intervenor $43,055.42 against the fund awarded to plaintiff and against Folk with the restriction that this judgment may be enforced only against the maintenance and cure awarded plaintiff.
The awards for plaintiff's loss of earnings were predicated on the court's finding that plaintiff is totally and permanently disabled. Folk argues this finding is contrary to the evidence. In order to address this question as well as some of the others raised by Folk we must first consider the medical evidence concerning his injury.
Three days after the accident plaintiff sought medical treatment from Dr. L. Thomas Cascio, an orthopedist. He thought plaintiff had a knee strain, placed him in a brace and told him to stay off work and to return to him the following week. Dr. Cascio saw plaintiff several times until the last visit on January 19 1989, when he suspected a meniscal tear and thought an arthroscopic examination might be warranted. Plaintiff decided to return to his home in Florida and to consult a doctor there rather than to submit to arthroscopy here in Louisiana.
On February 14, 1989, he saw Dr. Steven P. Surgnier, an orthopedist in Marianna, Florida. Based upon his examination Dr. Surgnier thought plaintiff had a torn medial meniscus and he recommended arthroscopy. He performed the arthroscopy on February 21 and his impression of a torn cartilage was confirmed. He removed the torn piece and trimmed and smoothed it. In this procedure general anesthesia is administered and the surgeon makes several stabs into the knee for the insertion of the arthroscope and surgical instruments.
Over the next several months Dr. Surgnier continued to treat plaintiff with medication and physical therapy, but plaintiff made little progress. On September 19, 1989, a second arthroscopy was performed and disclosed post traumatic arthritis and further tearing and fraying of the meniscus. Over the next several months plaintiff made no progress, and, by February, 1990 he was showing signs of a misalignment of the knee which eventually led to a tibial ostestony on March 13, 1990. Dr. Surgnier described this as a major surgical procedure in which a wedge of bone is broken off the tibia and the leg is broken and realligned so as to reallign the knee. Over the next few months of recovery from this surgery plaintiff continued to have difficulty, and, in July, Dr. Surgnier scheduled him for surgical removal of the staples. The following month plaintiff developed some cellulitis or infection over his incision site. The last time Dr. Surgnier saw plaintiff before the trial (October 16, 1990) was on August 29. He thought plaintiff would continue to have difficulty and would eventually require a knee replacement.
On the extent of disability, Dr. Surgnier stated that plaintiff could never return to his occupation on the dredge boat and he thought it unlikely that he could return to manual labor, farming, cutting and hauling timber, truck driving, loading trucks, or operating heavy equipment, tractors or bulldozers, jobs plaintiff held in the past. Dr. Surgnier recommended against excessive walking, bending, squatting, lifting, standing or jumping. However, he thought plaintiff could return to some more sedentary form of employment. While he could not handle the clutch on a truck he could operate one with automatic transmission. At trial plaintiff testified that he was still experiencing much pain in his knee, and was taking Darvocet for the pain; he tried to drive a truck in June, 1989 and could not; he cannot work in his garden or go fishing. He stated that he had hoped to work for Folk until he reached sixty-five years of age and could retire. The trial court made these findings as to plaintiff's disability:
Mr. O'Bryan has been followed by Dr. Surgnier since his initial visit and has basically improved very little. In fact, Mr. O'Bryan is still ambulating with a cane or crutch for support. The Court *905 finds that he is permanently disabled from doing work of any heavy nature and is limited from walking, bending, squatting or lifting. The Court further finds that Mr. O'Bryan will be restricted in the future from ever returning to any of his previous types of employment.
Mr. O'Bryan was born on April 9, 1930 and was 60 years of age at the time of the trial. He has a limited educational background and very limited vocational background. His work experience is limited. However, the testimony of the witnesses established at trial that Mr. O'Bryan was a satisfactory employee and but for his injury could have continued to work for Folk Construction. In fact, the testimony of Mr. Holifield, Folk Construction Company's representative at the trial was that Folk had more construction projects going on at the time of trial than it did in December of 1988, the date of plaintiff's injury.
These findings are supported by the record. Folk's argument that plaintiff is not disabled because he may find some sedentary type of work is not realistic considering that plaintiff was over sixty years old at trial time, had a limited educational and vocational background, and is a good prospect for a knee replacement. Folk's suggestion that he could find work as a security guard is likewise unrealistic considering the above factors along with the fact that plaintiff is ambulatory only with the aid of a cane.
The trial court awarded plaintiff $48,972 for loss of past wages. He based this figure on plaintiff's gross earnings at the time of the accident. In a Jones Act case a past wage loss award should be based upon plaintiff's net rather than gross income. Wright v. Ocean Drilling & Exploration Co., 444 So.2d 129, 136 (La.App. 4th Cir.1983). Plaintiff's net income for the fourteen weeks he worked was $5,826.22 or $416.16 per week. This is the equivalent of $1,801.97 per month so that his loss for the twenty-two months was $39,643.34.
The trial court awarded $106,596 for loss of future earnings. In doing so the judge found that plaintiff's work life expectancy (to sixty-five) was 4.7 years and he stated that the amount awarded was the result of an 8% discount based upon gross monthly earnings of $2,226 or annual earnings of $26,712.
Folk attacks this figure on three grounds: 1) plaintiff's work history belies his stated intention to work until he reaches sixty-five; 2) there was evidence to the effect that the job of shoreman was eliminated in March or April, 1989; and 3) the trial court's calculations are flawed. As to the first and second points, plaintiff testified that he had every intention of staying with Folk until he reached retirement age. The trial court's credibility evaluation of plaintiff and reasonable inferences from that testimony will not be disturbed. Folk's vice-president testified that plaintiff's work was satisfactory and he would probably be rehired even if laid off. However, he also indicated that the business continued to prosper after the date of the accident. From this the court could infer that plaintiff's continued employment was likely had it not been for the accident.
As to the trial court's calculations, the problem in that court as well as here is the lack of evidence to assist in the calculation of a proper award. The only expert evidence in the record is a written report by Folk's economist. In reasons for judgment the court specifically rejected this expert's computations which were based upon the average of plaintiff's earnings for the five years preceding the accident rather than his projected earnings based upon his salary with Folk. Despite a sporadic work record of the plaintiff in the past, the trial court may accept as credible the plaintiff's testimony that he would have continued to occupy the position held at the time of the accident and continue to earn the position's salary in the future. Deakle v. John E. Graham & Sons, 756 F.2d 821, 829 (11th Cir.1985). Consequently, we derive no benefit on appeal from the rejected calculations of Folk's economist. Furthermore, with only the report in the record this court is deprived of a detailed discussion as to *906 how all of the calculations were made and the results obtained.
In the Deakle case the court took the position that when the record contained no support for adjustments and calculations which would normally be applicable to a claim for lost future earnings such adjustments would be eliminated. There are factors missing from the record on both sides. Plaintiff failed to present any evidence to support inflationary or other increases in his salary over the 4.7 years of his work-life expectancy. On the other hand, the trial court's use of his gross income rather than net income is inconsistent with Deakle, supra, at page 830. In this connection we are aware of this court's statement in the Wright case at page 135, "we are not persuaded ... that the award [for loss of future earnings] should be reduced to a `net' amount after taxes." However, we do not consider this a definitive holding when the statement is read in context with the opinion's following paragraph; and we consider Deakle, which post-dated Wright, to be the controlling authority in this Jones Act case.
In another situation we might be inclined to remand this case to the trial court for a detailed application of the formula spelled out in Deakle for computation of plaintiff's loss of future earnings, but this is not warranted in the instant case considering all the circumstances. As discussed there are adjustments to be made on both sides so they may wash out. Next, we are dealing here with only 4.7 years of work life expectancy so that a detailed application of the Deakle formula would not make a substantial change in the result.
In Louisiana the trial court is vested with much discretion in awards for loss of future earnings and appellate courts do not disturb such awards in the absence of an abuse. While federal cases such as Deakle seem to suggest that less discretion and more mathematical precision are required in Jones Act cases we are not persuaded that the present award is necessarily erroneous. Our conclusion is buttressed by our own calculations which show that the award of $106,596 invested at 6% will yield four annual installments of $26,712 plus an equivalent amount for the remaining seven-tenths of the year when he reaches sixty-five years of age.
Next, Folk takes issue with the trial court's award of $10,000 for future medical expense. The record supports the award. Future surgery for a knee replacement seems likely. Dr. Surgnier stated that his present fee for such surgery would be above $2,500 and he thought hospitalization from seven to fourteen days would be required. We find no error in this particular award.
As to the general damage award of $150,000, we are accustomed to deferring to the much discretion of the trial court in considering whether the quantum is excessive. Since this is a Jones Act case we consider whether the award shocks the conscience of the court. By either standard we affirm. Plaintiff was under continuous medical care from the date of the injury in December, 1988, until the trial in October, 1990. He had undergone a major surgical procedure along with two arthroscopies in this period and was left handicapped and totally disabled from physical work. He suffers from post traumatic arthritis. In the future he will probably undergo another major surgical procedure for a knee replacement. These considerations support the judgment for general damages.
The trial court's award of $38 per day for "maintenance" is not supported by the record. When a seaman is injured in the service of a ship the shipowner is entitled to corroboration of the claim. Morales v. Garijack, Inc., 829 F.2d 1355, 1358 (5th Cir.1987); McWilliams v. Texaco, Inc., 781 F.2d 514 (5th Cir.1986). Plaintiff presented no evidence of his expenses for food and lodging. The figure of $38 per day surfaced during his testimony because this was the daily equivalent of the Louisiana Worker's Compensation benefits he was receiving. Asked whether this covered his daily living expenses he replied, "Barely." His living expenses for himself and his family were necessarily beyond his personal needs for food and lodging which maintenance is designed to provide. Consequently, *907 the $38 is immaterial to the issue and the trial court's award of $24,831 is unsupported.
Because plaintiff is probably entitled to something for maintenance the lack of any evidence in the record to support an award would seem to create an injustice, but for the unusual procedural posture of this case. The judgment in favor of Fidelity & Casualty Company as the intervening compensation carrier was restricted as to its payment out of maintenance and cure only. In effect, its recovery of compensation benefits paid to plaintiff is conditioned on plaintiff's recovery of maintenance. The court should have allowed recovery by the Fidelity out of plaintiff's recovery for loss of past earnings. Massey v. Williams-McWilliams Inc., 414 F.2d 675, 680 (5th Cir.1969). But since Fidelity did not take an appeal and is not a party to the appeal, the judgment cannot be modified in its favor. Therefore, the deletion from plaintiff's judgment of the $24,831 for maintenance results in a corresponding reduction in the amount awarded to intervenor. The judgment in plaintiff's favor will also be amended to delete Folk's liability for future maintenance.
As to the "cure" portion of the judgment this is likewise complicated by the compensation carrier's failure to take an appeal. The judgment in favor of plaintiff included $24,831 for maintenance and $24,384 for cure totalling $49,215. The cure figure was stipulated to be the total medical expenses paid by Fidelity. The judgment in favor of Fidelity is for only $43,055.42. This includes only $18,224 for cure which is the amount Fidelity claimed in its petition in intervention. Because we cannot increase Fidelity's judgment justice requires that plaintiff's judgment for cure be reduced to $18,224.
The last of Folk's specifications of error pertain to the interest on the entire judgment which the trial court awarded from the date of the accident. Since this case was tried to a judge and not a jury the award of interest is within the discretion of the court. Williams v. Reading & Bates Drilling Co., 750 F.2d 487 (5th Cir.1985). However, prejudgment interest cannot be awarded on future non-economic damages. Pickle v. International Oilfield Divers, Inc., 791 F.2d 1237 (5th Cir.1986). The $150,000 for general damages includes past and future pain, suffering and disability. We might consider a remand for the trial judge to provide an allocation of the award, but he is no longer on the bench. Our constitutional power to review the facts permits us to make this allocation which we determine to be fifty percent to each.
In conclusion, the judgment in favor of plaintiff will be amended to reduce his recovery for past lost income by $9,329.00 ($48,972-$39,643); to delete his recovery for maintenance in the amount of $24,831; to reduce his recovery for cure by $6,160 ($24,831+$24,384-43,055); and to provide for interest on the amount of the judgment from December 12, 1988 except on the amount of $75,000 on which interest will run from November 30, 1990. The judgment in favor of intervenor will be reduced to $18,224.
Accordingly, the judgment appealed from is affirmed but amended to the sum of $324,463 with interest on $75,000 of this amount from November 30, 1990 and interest on the balance from December 16, 1988. The judgment in favor of Fidelity and Casualty is reduced to $18,224 with interest from December 16, 1988 payable out of plaintiff's judgment.
AMENDED AND AFFIRMED.

ON REHEARING
On the application of Folk Construction Company we granted a rehearing in order to reconsider the award of prejudgment interest on future economic damages and the award of cure to appellee.
While Williams v. Reading & Bates Drilling Co., 750 F.2d 487, 491 (5th Cir.1985), held that prejudgment interest may not be awarded with respect to future damages; in Pickle v. International Oilfield Divers, Inc., 791 F.2d 1237 (5th Cir. 1986) the same court qualified the rule to exclude future, unaccrued non-economic damages from prejudgment interest. However *908 in Martin v. Walk, Haydel & Associates, Inc., 794 F.2d 209, 212 (5th Cir.1986) and Verdin C & B Boat Co., Inc., 860 F.2d 150, 158 (5th Cir.1988), the court citing Williams and ignoring Pickle held that those plaintiffs were not entitled to prejudgment interest on any future damages. In Verdin the court stated:
We have held on numerous occasions that awards of prejudgment interest on future damages are not available for the common-sense reason that those damages compensate future harm for which no interest could possibly have accrued before trial. (emphasis in the original).
Folk's position with respect to the award of cure is likewise meritorious. All of appellee's medical expenses were paid by Folk's compensation carrier, Fidelity. It is essential for recovery of cure that the injured plaintiff actually incur these expenses. Brown v. Aggie & Millie, Incorporated, 485 F.2d 1293, 1296 (5th Cir.1973). Since appellee incurred no expenses he is not entitled to the award of $18,224.00.
Accordingly, the judgment is further amended to reduce the award to $306,239.00 which consists of the following:

Past Lost Income $ 39,643.00
Future Lost Income 106,596.00
Future Medical Expenses 10,000.00
Past General Damages 75,000.00
Future General Damages 75,000.00
 ___________
 Total $306,239.00

Interest is to run on the future damages ($106,596.00 plus $10,000.00 plus $75,000.00) of $191,596.00 from November 30, 1990 and on the balance of $114,643.00 from December 16, 1988.
In all other respects the judgment is affirmed.
JUDGMENT FURTHER AMENDED AND AFFIRMED.