**Burrell JOHNSON, Plaintiff,**

v.

**STONE CONTAINER, Defendant.**

**No. CV97–H–2195–S.**

United States District Court,
N.D. Alabama,
Southern Division.

March 22, 2000.

C. Michael Quinn, James Alan Mendelsohn, Lee David Winston, Gordon, Silberman, Wiggins & Childs, Birmingham, AL, for Burrell Johnson, plaintiff.

Regina Alberini Young, Lori S. Patterson, Rogers Towers Bailey, Jones & Gay PA, Patricia J. Hill, Jacksonville, FL, for Stone Container, defendant.

## MEMORANDUM OF DECISION AND ORDER

HANCOCK, District Judge.

On August 21, 1997 plaintiff initiated this action by filing a complaint alleging race discrimination and retaliation pursuant to 42 U.S.C. § 1981 and Title VII. His race discrimination claims were predicated upon: alleged discriminatory pay; alleged discrimination in the denial of requested vacation days; alleged discrimination by being required to work sixteen-hour shifts; alleged discrimination in shift assignments; alleged discrimination in the refusal to transfer him to a position in the warehouse; and alleged discrimination in the administration of discipline. As to his retaliation claims plaintiff asserted that following the filing of an EEOC charge on November 26, 1996 defendant in retaliation for that charge: reprimanded and/or suspended him April 24, 1997; reprimanded him May 7, 1997; gave him an unfavorable performance review in the summer of 1997; suspended him for one day on November 17, 1997 with pay; and failed to select him over Tony Bradford for transfer in March of 1998 off the night shift.

On October 6, 1998 the court granted summary judgment in defendant's favor on plaintiff's race discrimination claims predicated upon discriminatory pay, denial of requested vacation, requiring sixteen-hour shifts, shift assignments, and administration of discipline. The only racial discrimination claim which survived summary judgment was predicated upon defendant not transferring plaintiff in 1996 to the newly created shipping supervisor's position in the warehouse. Plaintiff's entire retaliation claim survived summary judgment.

A jury was selected November 16, 1998 and the case proceeded to trial on plaintiff's remaining claims of race discrimination predicated upon the failure to receive a transfer in 1996 to the newly created shipping supervisor's position in the warehouse and on his retaliation claim predicated upon the five previously identified employment decisions. Plaintiff rested his case late in the afternoon of the first day of trial and the court denied defendant's Rule 50(a) motion predicated only on insufficient evidence to support a prima facie case. Defendant rested after lunch on the second day of trial and following a recall of plaintiff to the stand by plaintiff's counsel, plaintiff again rested. The case was argued and the jury instructed, with deliberations beginning about 4:00 p.m. Approximately twenty-four hours later,

the jury returned a verdict in defendant's favor on plaintiff's remaining race discrimination claim and returned a verdict in plaintiff's favor on three of plaintiff's retaliation claims. As reflected by the special verdict utilized by the court (a copy of which is attached as Appendix A hereto), the jury concluded that plaintiff had failed to establish retaliation based upon the April 24, 1997 reprimand and based upon the March 30, 1998 failure to receive a transfer off the night shift but found that the employment decisions involving the May 7, 1997 reprimand, the summer of 1997 unfavorable performance review and the November 17, 1997 one-day suspension with pay were in retaliation for the filing of plaintiff's November 26, 1996 EEOC charge. The jury awarded plaintiff $50,000 to compensate him for any emotional pain, suffering, inconvenience, mental anguish or loss of enjoyment of life sustained by him as a proximate result of the retaliation by defendant. The jury further concluded that defendant's offensive retaliatory conduct toward plaintiff was with malice or with reckless indifference to plaintiff's federally protected rights and awarded him $150,000 in punitive damages.

Following the presentation of evidence associated with the issue of appropriate equitable relief, the court on March 19, 1999 entered final judgment awarding plaintiff $50,000 compensatory and $150,000 punitive damages on his retaliation claims but entered judgment for defendant on the remaining race discrimination claim. The final judgment included appropriate injunctive relief under the circumstances.

Plaintiff filed a motion for attorneys' fees on March 30, 1999. On April 2, 1999, defendant filed a renewed motion for judgment as a matter of law under Rule 50(b) and a motion for new trial or remittitur under Rule 59, together with a brief in support of those motions.[1] An April 9, 1999 order, as modified April 27, 1999,

established a briefing schedule with regard to defendant's post-trial motions. Although the court had other and more serious concerns with the right of plaintiff to prevail in this action based upon the verdict of the jury, that order specifically noted the court's concern with the paucity of evidence at trial supporting an award as high as $50,000 to compensate for mental anguish associated with the three incidents where an employment decision was found by the jury to be impermissibly tainted by a retaliatory intent. For that reason the court instructed counsel for plaintiff to attach to plaintiff's brief a copy of excerpts of all trial testimony and exhibits which arguably supported (a) the fact of any such mental anguish and (b) its causal connection with the three acts of retaliation. The April 9, 1999 order also expressed concern as to the proper approach to the punitive damage award in view of *Dudley v. Wal-Mart,* 166 F.3d 1317 (11th Cir.1999) which was decided subsequent to trial. The court's order also specifically expressed concern regarding the matter of conduct supported by the evidence which will justify an award of punitive damages. Consequently, counsel for defendant was directed to attach to defendant's brief excerpts of all trial testimony and exhibits which arguably are relevant to the presence or absence of reckless or egregious conduct and relevant to the identity of the actor and relevant to a determination of whether the discriminating employee was high up in the corporate hierarchy or higher management approved the behavior. The brief of defendant was also to address whether Hatfield, Harbin and/or Cook, on the basis of the evidence in the record, should as a matter of law be viewed as within "corporate hierarchy" or "higher management." Both parties were given the opportunity to file a responsive brief which could also include exhibits. The parties were also specifically instructed by the April 9, 1999 order to file a brief by July 22, 1999, should an opinion be issued by the Su-

---

1. The motion was also filed under Rule 60 but as filed thereunder it has no merit and is

DENIED.

preme Court in the there pending case of *Kolstad v. American Dental Association* by July 1, 1999, as such opinion may be relevant to any of the issues pending before the court.

In addition to the April 2, 1999 motions and brief of defendant, the court has before it the following matters filed pursuant to the April 9, 1999 order, as amended April 27, 1999: the May 24, 1999 submission by plaintiff; the June 7, 1999 submission by defendant; the June 10, 1999 brief by defendant; the July 9, 1999 response of defendant; the July 9, 1999 submission by plaintiff; and the July 22, 1999 brief by defendant. The April 2, 1999 motions are now overripe for a decision. As noted earlier, plaintiff filed on March 30, 1999 a motion for an award of attorneys' fees and costs. On July 22, 1999 plaintiff filed an updated motion for fees and expenses which update defendant seeks to strike by its August 9, 1999 response and motion. Plaintiff filed an opposition on August 18, 1999 to the August 9, 1999 motion. Those three motions are also ripe for a decision. Having considered all of the foregoing and the entire record herein, the court reaches the following conclusions with regard to the pending motions.

### RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW UNDER RULE 50(B)

At the conclusion of plaintiff's case in chief defendant moved for a judgment as a matter of law only on the ground of lack of evidence to establish a prima facie case. The renewed motion under Rule 50(b) for judgment is limited to that ground. *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1289 (11th Cir.1998). The motion is **DENIED**.

### MOTION FOR NEW TRIAL OR REMITTITUR UNDER RULE 59 WITH REGARD TO COMPENSATORY DAMAGES

In its April 9, 1999 order the court expressed substantial concern regarding evidence sufficient to support an award as high as $50,000 to compensate plaintiff for mental anguish associated with defendant improperly considering the filing of a charge with EEOC when (1) it entered in plaintiff's employment file the May 7, 1999 reprimand, (2) it gave plaintiff an unfavorable performance review on June 1 or July 15, 1997 and (3) it suspended plaintiff with pay for one day on November 17, 1997. Counsel for plaintiff was instructed to attach to his brief as an exhibit, "a copy of excerpts of all trial testimony and exhibits which arguably support the fact of any such mental anguish and its causal connection with the three acts of retaliation." The only evidence which counsel for plaintiff attached to the May 24, 1999 brief were pages 51, 60, 71, 73, 111, and 115 of the trial transcript.[2] These attachments clearly confirm the court's concern over the paucity of evidence to support a determination of mental anguish, much less to support an award of $50,000 for any such mental anguish. For the convenience of the parties, a copy of pages 51, 60, 71, 73, 111, and 115, plus page 72 discussed in footnote 2, are attached to this order as Appendix B. Although the court still has doubt that plaintiff presented *any* evidence of mental anguish experienced by plaintiff as a result of the May 7, 1997 reprimand or the June 1 (or July 15), 1997 unfavorable performance review or the November 17, 1997 one-day suspension with pay,[3] out of deference to the jury the court will

---

**2.** The evidence reflected on transcript page 73 is directly connected with plaintiff's claim which the jury *rejected* based on a failure to be transferred from the night shift, either in 1996 (race claim) or in March of 1998 (retaliation claim). On transcript page 72 plaintiff was asked "How has working the third shift affected you, Burrell Johnson?" and his testimony on pages 72 and 73 are directly related to that question. The submission of only page

73, without pages 72, and representing that the testimony on page 73 is evidence supporting an award for mental anguish could well be viewed as misleading.

**3.** Not one of these even rise to the level of an adverse employment action, which is necessary to support the jury verdict. Collectively, however, the court will charitably consider them sufficient to be the requisite adverse

conclude that it heard some, but no more than a bare minimum, of evidence of mental anguish at the trial. The court is absolutely certain that an award of $50,000 for any such mental anguish was grossly excessive. The court concludes that $7,500 is "the maximum possible award that is reasonably supported by the evidence in the record." *Deakle v. John E. Graham & Sons,* 756 F.2d 821, 827 (11th Cir.1985). The motion for a new trial, to the extent it is predicated upon excessive compensatory damages, is **DENIED**, but such denial is **CONDITIONED UPON** plaintiff's filing by **April 7, 2000** a written remittitur of the excessive $42,500 in compensatory damages awarded by the jury. Should plaintiff fail to timely file such remittitur, the court will set aside the March 19, 1999 final judgment and grant a new trial as to every aspect of plaintiff's claim of retaliation under Title VII predicated on the May 7, 1997 reprimand; the June 1 or July 15, 1997 unfavorable performance review and/or probation; and the November 17, 1997 one-day suspension with pay.

## MOTION FOR NEW TRIAL OR REMITTITUR UNDER RULE 59 WITH REGARD TO PUNITIVE DAMAGES

■ In its April 9, 1999, order the court noted that *Dudley v. Wal–Mart, Inc.,* 166 F.3d 1317 (11th Cir.1999) was decided subsequent to trial and that the Supreme Court was expected to rule by the end of June 1999 in an important, and likely relevant, then-pending case. The Supreme Court did issue an opinion in *Kolstad v. American Dental Assoc.,* 525 U.S. 1120, 119 S.Ct. 900, 142 L.Ed.2d 900 (1999). The court has considered the issue of punitive damages in light of its oral charge to the jury and in light of both the *Dudley* and the *Kolstad* cases. While the matter is by no means free from doubt, the court concludes there was marginal but sufficient evidence to support a conclusion that

an important managerial employee[4] acted with reckless indifference to, or serious disregard for, plaintiff's rights protected by Title VII. Although it is difficult to pinpoint the evidence which supports this conclusion, the court believes that Harbin, Cook and Smith were aware of a perceived risk that the attacked employment actions would violate Title VII. There was clearly insufficient evidence to support a conclusion that any one of the decision makers acted with malice or an intent to harm. The fact that an award of punitive damages was appropriate is not the end of the inquiry because the award of $150,000 was grossly excessive. The court concludes that $20,000 is "the maximum possible award" of punitive damages "that is reasonably supported by the evidence in the record," *Deakle,* 756 F.2d at 827. The motion for new trial, to the extent it is predicated upon excessive punitive damages, is **DENIED**, but such denial is **CONDITIONED UPON** plaintiff's filing ·by **April 7, 2000** a written remittitur of the excessive $130,000 punitive damages awarded by the jury. Should plaintiff fail to timely file such remittitur, the court will set aside the March 19, 1999 final judgment and grant a new trial as to every aspect of plaintiff's claim of retaliation under Title VII predicated on the May 7, 1997 reprimand; the June 1 or July 15, 1997 unfavorable performance review and/or probation; and the November 17, 1997 one-day suspension with pay.

## ORIGINAL AND UPDATED MOTIONS FOR ATTORNEYS' FEES AND MOTION TO STRIKE UPDATED MOTION

■ On March 30, 1999, counsel for plaintiff filed a motion requesting $120,690 in fees and expenses. There is no explanation for the amount requested and is inconsistent with the following specific charges detailed in the motion:

employment action. *See Wideman v. Wal–Mart Stores, Inc.,* 141 F.3d 1453 (11th Cir. 1998).

**4.** Ronald Harbin and Rodney Cook were relevant plant managers and Glen Smith was

plant superintendent. The only employee above them at the plant was the facility's general manager, Brett Hatfield.

| Mendelsohn | 82.70 hours at $250 | $20,675.00 |
| Winston | 181.80 hours at $150 | 27,270.00 |
| Paralegal | 63.40 hours at $ 65 | 4,121.00 |
| Expenses | | 2,224.12 |
| | Total | $54,290.12 |

On July 22, 1999, counsel for plaintiff filed an updated motion requesting $62,357.16 in fees and expenses. The motion sets out the following details:

| Mendelsohn | 107 | hours at $250 | $26,750.00 |
| Winston | 170 | hours at $150 | 25,500.00 |
| Paralegal | 63.4 | hours at $ 65 | 4,121.00 |
| Law Clerk | 50 | hours at $ 50 | 2,500.00 |
| Expenses | | | 3,486.16 |
| | Total | | $62,357.16 |

Both motions represent to the court that counsel had excluded hours solely dedicated to preparation and trial of the race discrimination claims (as opposed to the retaliation claims). Both motions further represent there are no circumstances or other factors which would justify a further reduction or denial of fees, costs and expenses. The July 22, 1999, updated motion further represents that counsel submitted, with two exceptions, the monthly data, required by the October 30, 1997, order.[5] The updated motion also has two attorney affidavits and an itemization of expenses attached. The August 9, 1999 motion of defendant to strike the updated motion is **DENIED.**

Pursuant to the October 30, 1997 order plaintiff filed the following notices of attorney hours and non-attorney hours devoted to the case for the months indicated.

| Document | Month Covered | Attorney Hours | Non–Attorney Hours |
|---|---|---|---|
| 9 | Sept.–Oct.1997 | 6.75 | .70 |
| 14 | Nov.1997 | 4.25 | .85 |
| 15 | Dec.1997 | 3.25 | 4.00 |
| 16 | Jan.1998 | 5.50 | 5.15 |
| 17 | Feb.1998 | 0.00 | .45 |
| 18 | Apr.1998 | 14.00 | 1.25 |
| 31 | Aug.1998 | 36.75 | 11.00 |
| 68 | Nov.1998 | 148.00 | 25.6 |

| Document | Month Covered | Attorney Hours | Non–Attorney Hours |
|---|---|---|---|
| 69 | Dec.1998 | 4.20 | 0.00 |
| 78 | Mar.1999 | 4.10 | 0.00 |
| 88 | Apr.1999 | 11.60 | 0.00 |
| 97 | May 1999 | 21.65 | 32.00 |
| 100 | June 1999 | 9.20 | 11.50 |
| 105 | July 1999 | 20.35 | 20.50 |
| 107 | Aug.1999 | 16.80 | 0.00 |
| | | 306.40 | 113.00 |

While the accounting for the nature of the work performed by counsel during such hours is not nearly as detailed on the sealed records as required by the October 30, 1997, order (see footnote number 5, the October 30, 1997, order and the detailed time records filed March 14, 2000), the unsealed records generally support a conclusion that a total of 306 attorney hours were devoted to this case for plaintiff. The affidavit of James Mendelsohn states that he eliminated 13 hours from the 120 hours he devoted to the case as "duplicative or otherwise non-compensable hours" and hence is seeking reimbursement for the 107 hours shown on the July 22, 1999 updated motion, at the hourly rate of $250, which was his current rate on July 22, 1999. The affidavit of Lee Winston states that he eliminated 32 hours of the 202 hours he devoted to the case also "to eliminate duplicative or otherwise non-compensable hours" and hence is seeking reimbursement for 170 hours shown on the July 22, 1999 updated motion at the hourly rate of $150, which was his current rate on July 22, 1999. The 120 hours of Mendelsohn and the 202 hours of Winston are 32 hours more than recorded in the detailed time records filed by counsel under seal pursuant to the October 30, 1997 order for the entire time period of September 1997 through July of 1999. Further, while the updated motion for fees advises the court

5. The October 30, 1997 order required counsel, at counsel's election, to file for public review or under seal each month a record of time with a complete and accurate accounting of all time devoted to this particular action (to the nearest 1/10 of an hour), recorded contemporaneously with the time expended, for each attorney with sufficient detail to disclose the nature of the work performed in the action (i.e., not just "research" but the specific matter being researched; not just "conference" but identity of persons conferring and general subject matter of the conference). If counsel elected to file this record under seal, the filing of an additional document, not under seal, was required noticing the total hours reflected for the preceding month on the records being filed under seal. Plaintiff elected to file the detailed records under seal, and the court removed them from that seal in accordance with the October 30, 1997 order and caused them to be openly filed on March 14, 2000.

that counsel has excluded from the hours for which compensation is sought the hours devoted to plaintiff's six race discrimination claims as to which plaintiff did not prevail, the affidavits do not so advise the court unless those hours are within the "otherwise non-compensable hours" to which passing reference is made in the affidavits.

Counsel for plaintiff are not entitled to be compensated for the hours solely devoted to pursuing plaintiff's racial discrimination claims involving demotions, promotions, pay, vacation days, sixteen-hour shifts, discipline and his assignment to the third shift which he lost under the October 6, 1998 summary judgment order; counsel for plaintiff are not entitled to be compensated for the hours devoted solely to pursuing plaintiff's racial discrimination claim involving the failure to transfer him off this night shift in 1996 to the newly created shipping supervisor's position in the warehouse which the jury rejected; and counsel for plaintiff are not entitled to be compensated for the hours devoted solely to pursuing plaintiff's retaliation claims involving the April 24, 1997 reprimand and/or suspension and the March 30, 1998 failure to be selected for transfer off the night shift which the jury also rejected. *Texas Ass'n v. Garland*, 489 U.S. 782, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989). Counsel are only entitled to include in the lodestar the hours related to the successful pursuit of the retaliation claims involving the May 7, 1997 reprimand; the June 1 or July 15, 1997 unfavorable performance review and/or probation, and the November 17, 1997 one-day suspension with pay. Unfortunately the time records filed under seal as the case progressed did not set forth the detail required by the October 30, 1997 order. Had the court not required detailed time records to be filed, it would consider requiring plaintiff at this late date to provide more detail. But the court is entitled to assume that contemporaneous details available at the time were delivered to the court pursuant to the October 30, 1997 order, and the court will consider those details, its knowledge of the

case, the briefs and other material submitted in connection with the summary judgment motion resolved by the October 6, 1998 order (including particularly the depositions submitted to the court), and the transcript of the two-day trial in November 1998. In this connection the court notes that 36 hours of counsel's time was spent in August of 1998 (largely summary judgment work) and 148 hours of counsel's time was spent in November of 1998 (the trial month). Thus it is likely that about two-thirds of the claimed hours were devoted to those two aspects of the case. A page-by-page review of the trial transcript satisfies the court that *at least* one-third of the entire trial was focused solely on the one race discrimination claim the jury rejected. A relatively minor part of the trial was focused solely on the two retaliation claims the jury rejected. And the balance of the trial time was either applicable in part or solely to the three retaliation claims on which plaintiff prevailed. The submissions on summary judgment indicate that closer to one-half of the work product of plaintiff's counsel addressed solely the race discrimination claims.

James Mendelsohn seeks to be compensated for 107 hours, virtually all of which were associated with the trial phase. The court concludes that two-thirds or 72 of those hours should be taken into account in determining the lodestar. The starting point for a determination of the reasonable rate to apply to those 72 hours is $250, which is what Mendelsohn claims as his customary hourly rate. But the court considers that hourly rate in light of "its own knowledge and experience concerning reasonable and proper fees." *Norman v. Housing Authority of the City of Montgomery*, 836 F.2d 1292, 1303 (11th Cir. 1988). As so considered the court concludes that a reasonable rate in this case for Mendelsohn's services is $200 per hour.

Lee Winston seeks to be compensated for 170 hours at all stages of the case. The court concludes that three-fourths or 127 of those hours should be taken into

account in determining the lodestar. The starting point for a determination of the reasonable rate to apply to those 127 hours is $150, which is what Winston claims as his customary hourly rate. But again the court considers that hourly rate in light of "its own knowledge and experience concerning reasonable and proper fees." *Norman,* 836 F.2d at 1303. As so considered the court concludes that a reasonable rate in this case for Winston's services is $125 per hour.

The court will apply the same twenty-five percent reduction in hours applied to Winston to the 63.4 paralegal hours and the 50 law clerk hours, resulting in 47.5 paralegal hours and 37.5 law clerk hours.[6] Taking into consideration its own knowledge and experience the court will set $50 as a reasonable rate in this case for a paralegal hour and $35 as a reasonable rate for a law clerk hour.

Utilizing the foregoing the court concludes that the lodestar in this case should be $33,962, determined as follows:

| | | | |
|---|---|---|---|
| Mendelsohn | 72 | hours at $200 | $14,400.00 |
| Winston | 127 | hours at $125 | 15,875.00 |
| Paralegal | 47.5 | hours at $ 50 | 2,375.00 |
| Law Clerk | 37.5 | hours at $ 35 | 1,312.00 |
| | | | $33,962.00 |

■ The lodestar, however, is simply that, a point of beginning. *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). It is subject to upward or downward movement after a consideration of the twelve factors enumerated in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974). *See Blanchard v. Bergeron,* 489 U.S. 87, 94,

109 S.Ct. 939, 103 L.Ed.2d 67 (1989) ("The *Johnson* factors may be relevant in adjusting the lodestar amount but no one factor is a substitute for multiplying reasonable billing rates by a reasonable estimation of the number of hours expended on the litigation.") This case presented no novel or difficult question. Only average skill was required in this case to perform the legal services properly. The case should not have precluded acceptance of any other work by counsel. The customary fee in cases of this nature is a lodestar adjusted in accordance with *Johnson.* The payment of counsel's fee was contingent upon counsel's success. Even though plaintiff's counsel did not prevail on eight of the eleven claims pursued by plaintiff, the result certainly should have pleased plaintiff, even though it was grossly excessive and not supported by the evidence. The court is aware of no out of the ordinary time limitations imposed on counsel. This case can hardly be viewed as undesirable since cases of this nature are routinely handled by counsel as a significant part of their practice. Records in the clerk's office reflect that the total number of employment discrimination cases filed in the Northern District of Alabama in 1997, 1998 and 1999 by the firm of Gordon, Silberman, Wiggins and Childs and without that firm were as follows: [7]

| Calendar Year | Job Discrimination Cases filed by Gordon, Silberman, Wiggins & Childs | Job Discrimination Cases filed without Gordon, Silberman, Wiggins & Childs |
|---|---|---|
| 1997 | 141 | 562 |
| 1998 | 151 | 499 |
| 1999 | 127 | 601 |

---

6. Actually the paralegal hours and law clerk hours should be reimbursed as expenses, but since counsel includes them in the lodestar and it really makes no difference in the outcome, the court will view them in the lodestar. Were this a case where a fee above or below the lodestar is appropriate clearly they should be viewed as an expense item.

7. While not relevant it is interesting to note that during the fiscal years ending in 1997, 1998 and 1999 a total of 9,957 civil cases were filed in the Northern District of Alabama. Of those cases, 7,842 were cases other

than social security, bankruptcy appeals, habeas corpus petitions and actions to recover student loans. Of those 7,842 cases, 2,081, or approximately 26% were employment discrimination actions. The firm of Gordon, Silberman, Wiggins and Childs filed 419, or 20% of all employment discrimination actions filed in this court during those years. Those 419 cases represent approximately 5% of all civil actions commenced in the Northern District of Alabama during 1997, 1998 and 1999, excluding social security and bankruptcy appeals, petitions for habeas corpus and actions to recover student loans.

The court is aware of fee awards in similar cases in the state of Alabama and in the Northern District of Alabama in particular and is of the opinion that the fee being awarded is within the range of fees awarded in similar cases. And there are no special circumstances or other factors which would justify an increase or a decrease of the lodestar determined by the court.

The updated motion also seeks an award of expenses in the amount of $3,486.16 and Exhibit 3 attached to that motion clearly supports an award of the claimed amount. Thus an award of attorneys' fees will include an award of $3,486.16 in expenses.

## CONCLUSION

Should plaintiff fail to file either of the necessary remittiturs earlier required as a condition to the denial of the motion for a new trial, the court will set aside the March 19, 1999 final judgment and grant a new trial on all aspects of the retaliation claims predicated upon: the May 7, 1997 reprimand; the June 1 or July 15, 1997 unfavorable performance review and/or probation; and the November 17, 1997 one-day suspension with pay since the jury verdict is grossly excessive and against the weight of the evidence. The court is of the opinion that the verdict, in the light of the evidence, is so unreasonable that it would be unconscionable to allow it to stand. Should a new trial be ordered, the court will forego an award of attorneys' fees at this time. But should plaintiff file the necessary remittiturs, the court will enter an amended final judgment reflecting $7,500 in compensatory damages, $20,000 in punitive damages, and the same injunctive relief set forth in the March 19, 1999 final judgment. In that event, the court also will award attorneys' fees totaling $33,962 and expenses totaling $3,486.16.

## APPENDIX A

### SPECIAL QUESTIONS TO THE JURY

*Question 1:* Has *plaintiff* satisfied you that it is more likely true than not true that plaintiff's race was a motivating factor in the decision by defendant not to transfer him in 1996 to the newly created shipping supervisor's position in the warehouse?

Yes _____ No __X__

*Question 2:* Has *plaintiff* satisfied you that it is more likely true than not true that plaintiff's EEOC charge or his opposition to employment practices made illegal by the Civil Rights Laws was a motivating factor in one or more of the challenged employment decisions by defendant made after the November 26, 1996 filing of the EEOC charge (in answering this Question remember my instruction that all members of the jury must agree on the one or more challenged decisions before you can answer "yes")?

Yes __X__ No _____

DO NOT ANSWER ANY FURTHER QUESTIONS IF YOUR ANSWERS TO QUESTIONS 1 AND 2 ARE "NO"

DO NOT ANSWER QUESTION 3 IF YOUR ANSWER TO QUESTION 2 IS "NO."

*Question 3:* Which of the following challenged employment decisions did you unanimously conclude plaintiff established by a preponderance of the evidence as acts of retaliation and therefore served as the basis for your answer to Question 2?

(a) April 24, 1997 reprimand and/or suspension.

Yes _____ No __X__

(b) May 7, 1997 reprimand.

Yes __X__ No _____

(c) June 1 or July 15, 1997 unfavorable performance review and/or probation.

Yes __X__ No _____

(d) November 17, 1997 one day suspension with pay.

Yes __X__ No _____

(e) March 30, 1998 failure to be selected instead of Tony Bradford for transfer off of the night shift.

Yes _____ No __X__

**Question 4:** If your answer to Question 1 or to Question 2 is "yes," then what amount, if any, of damages do you find that it is more likely true than not true that plaintiff is entitled to recover from defendant to compensate plaintiff for any emotional pain, suffering, inconvenience, mental anguish or loss of enjoyment of life sustained by plaintiff as a proximate result of the intentional discrimination by defendant?

*$50,000*

**Question 5:** If your answer to Question 1 or to Question 2 is "yes," has **plaintiff** satisfied you that it is more likely true than not true that defendant's offending discriminatory conduct toward plaintiff was with malice or with reckless indifference to plaintiff's federally protected rights so that an award of punitive damages is appropriate?

Yes __X__ No _____

**Question 6:** If your answer to Question 5 is "yes," what amount, if any, of punitive damages do you assess against defendant and award to plaintiff?

*$150,000*

## APPENDIX B

off the third shift, and after you filed an EEOC charge, did the terms and conditions of your job change?

A Yes, it did.

Q And how did it change?

A I mean, I was written up about everything that happened on the third shift. Some things I didn't have no control over.

Q And you say you were written up. What do you mean?

A Well, before I filed the charges, I had a work performance that was satisfactory to the company. But after I filed the charges, all my work performance went down, you know, I come to work at night not knowing whether or not I got a job.

MR. WINSTON: Your Honor, may I approach the witness?

THE COURT: Yes, sir.

Q (Indicating). Can you identify the document I put in front of you?

A Yes, I can.

Q Can you tell the jury what the document is?

A It's a performance review.

Q Can you tell me the date?

A 6–1–95.

A No, remained the same.

Q Did a review such as this, how does this affect your record with the company?

A It goes into my file and I don't get a raise.

Q On the July '97 review, there is a number there at the bottom, the total?

A Yes.

Q And can you read what that number is?

A Are you referring to the summary rating in part B?

Q The overall rating.

A On 7–15 it's not—

Q On 7–15 on Plaintiff's 15?

A 4.51.

Q How does that translate on the scale?

A Marginal.

Q And after thirty years, after twenty-nine years, did you consider yourself a marginal employee at that time?

A I was wondering how I could go from successful to marginal in a short period of time.

Q Did you have any idea how your—the production of—how did the company measure your shift's performance?

A Based it by quality and the square foot that was

company, had you ever been suspended for being late to work prior to that time?

A No, I had not.

Q   And you observed other supervisors arriving late?

A   Yes.

Q   Which supervisors have you observed arriving late?

A   Tony Bradford is late all the time; Jeff Wyman, Dunn, all those were late.

Q   When you say late—

A   It's not unusual for a supervisor to be late.

Q   When you say hate, how late do you mean, an hour late?

A   A few minutes, five, fifteen minutes late.

Q   And what time did your shift officially start?

A   11:00.

Q   What time does the company want you there?

A 10:30.

Q   So when you say you are late—how often are you late?

A   Maybe once a month.

Q   Are you aware of any other supervisor that has been suspended for a number of days for being late for work?

A   No, I am the only supervisor that has been suspended for being late.

Q   Is it your impression that—do the employees on the third shift need more supervision?

A   Yes, they do.

Q   Have you been told why you are the sole supervisor on the third shift?

A   Nobody sat down and explained to me why, all the people I have on third shift, that I am the only supervisor there with them.

Q   How has working the third shift affected you, Burrell Johnson?

A   I mean, I usually spend the weekend with my grandkids, I can't no more.  I go home and go to sleep.  I am taking medicine for depression.

Q   What type of medicine are you taking?

A   It's—I can't think of the name right now.  And I am taking sleeping pills.

Q   When do you sleep now?

A   I have to try to sleep in the daytime.

Q   What hours?

A   When I get off, get home, I get home about 9:00 in the morning.

Q   Okay.

A   And I have to try to go to sleep in the daytime.

Q   Has that prevented you from partaking of any activities?

A   I can't do nothing but try to go to sleep.

Q   Has that affected your family life?

A   Yes, it have.

Q   How has that affected your family life?

A   I can't spend no time now with my grandkids, none whatsoever.

Q   If you resign, do you receive any—you don't have any—do you receive any benefits?

A   I checked into my retirement at age fifty-five, and they said I would get one hundred eighty-five dollars a month.

Q   And how old are you now?

A   I am—I will be fifty-two April.

Q   And do you need—are you dependent on this job as a source of income?

A   The only source I have.

Q   How does Stone Container to your knowledge pay their employees, pay their supervisory employees;  is it an annual salary?

A   It's based annually, but it's two times a month.

Q   Okay.  As working there, do you receive any bonuses depending on how the plant is doing?

A   We used to, but we haven't received none lately.  Been about five months since we received a bonus.

A   I don't know what they received.

Q As part of Stone Container's effort to improve quality at the plant, have you had to work on something called a quality variance report?

A No, I haven't.

Q You indicated in your direct examination that you had—every time you're on a particular shift, that shift produces the most paper; is that correct?

A Yes.

Q No other shift produces more paper than your shift that you were on?

A No.

Q Now, you indicated that you had been suspended on two occasions?

A Yes.

Q By suspension, please define that.

A I was sent home.

Q With pay?

A Yeah.

Q You were paid both times you were sent home?

A Yes.

Q No loss of income at all during those two suspensions, correct?

A Yes. The only fear I had was whether or not I had a job.

...than to other supervisors?

A Yes, I did.

Q Can you tell us what it is that you pointed out to Mr. Harbin?

A I pointed out to Mr. Harbin and Mr. Smith that I was the only supervisor that had been laid off on making an error around the plant.

Q After that time were other supervisors then laid off?

A He came back and laid Dewayne off about two weeks later.

MR. WINSTON: I don't have any further questions, Your Honor.

1. Some of the students have reached the age of majority during the pendency of this law-

THE COURT: Anything further from this witness at this time?

MS. HILL: One more question and then we reserve the right, Your Honor.

*RECROSS EXAMINATION*

*BY MS. HILL:*

Q With respect to your bonuses, do you know approximately how much money you received in 1997 from bonuses alone?

A No, not offhand.

MS. HILL: No further questions at this time, Your Honor.