[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

Nos. 14-12250 & 14-14434

_____

D.C. Docket No. 2:10-cv-00032-RWS


ABIGAIL MARILYN AYERS,
as Surviving Spouse and Administratix of the Estate of Jonathan Paul Ayers,

Plaintiff - Appellee
Cross Appellant,

versus

OFFICER BILLY SHANE HARRISON,
Individually and In His Official Capacity,

Defendant - Appellant
Cross Appellee,

OFFICER KYLE BRYANT,
Individually and In His Official Capacity, et al.,

Defendants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

(May 26, 2016)

Before JORDAN and DUBINA, Circuit Judges, and GOLDBERG, Judge.[*]

PER CURIAM:

Following our denial of qualified immunity on interlocutory appeal, *see Ayers v. Harrison*, 506 F. App'x. 883 (11th Cir. 2013), a federal jury in this civil rights case found that Officer Billy Shane Harrison violated the Fourth Amendment when he shot and killed the Reverend Jonathan Ayers in the parking lot of a gas station. *See generally* 42 U.S.C. § 1983; *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). The jury awarded Abigail Ayers—Jonathan's widow and representative—$2.3 million in damages, a sum the district court cut to $1.64 million after reducing the lost wages portion of the verdict. Officer Harrison appeals on a number of issues related to liability and the conduct of the trial, while Ms. Ayers cross appeals as to the reduced award of damages and the dismissal of her state law claims.

With the benefit of oral argument, and following a detailed review of the record, we affirm. Among other things, we conclude that the evidence amply supported the jury's verdict; that Officer Harrison was not entitled to qualified immunity; that the district court's failure to give the jury special interrogatories relating to qualified immunity, if error, was harmless; and that the district court did

---

[*]Honorable Richard W. Goldberg, Judge of the United States Court of International Trade, sitting by designation.

2

not err in reducing the lost wages portion of the jury verdict.  As we write for the parties, we set out only what is necessary to explain our decision.

# I

Officer Harrison first argues that the district court should have granted his Rule 50 motion for judgment as a matter of law because the jury could not have reasonably found that he violated Reverend Ayers' Fourth Amendment rights. According to Officer Harrison, his conduct was objectively reasonable.  We disagree.

Judgment as a matter of law is appropriate only if "there [wa]s no legally sufficient evidentiary basis for a reasonable jury to find for [Ms. Ayers]." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000) (internal quotation marks and citations omitted).  In reviewing the denial of Officer Harrison's Rule 50 motion, we examine the entire trial record and "must draw all reasonable inferences in favor of [Ms. Ayers,] the non-moving party."  *Id.* at 150 (citations omitted) (explaining that the Rule 50 standard mirrors the Rule 56 summary judgment standard).  *See also Action Marine, Inc. v. Cont'l Carbon Inc.,* 481 F.3d 1302, 1309 (11th Cir. 2007). Significantly, because "[v]irtually every jury verdict resolves a number of contested issues of fact without explicit factfindings," we "*always* infer that the jury resolved *every* relevant factual issue in favor of its

3

verdict." *United States v. $242,484.00*, 389 F.3d 1149, 1155 (11th Cir. 2004) (en banc) (emphasis added and citation omitted).[1]

The evidence presented at trial, viewed in the light most favorable to Ms. Ayers, allowed the jury to find that (1) Officer Harrison and his colleagues did not have probable cause to believe that Rev. Ayers was armed or dangerous or involved with drugs when they approached him in the gas station in their unmarked royal blue Cadillac Escalade pickup truck; (2) the Escalade, without warning, partially blocked Rev. Ayers' car; (3) Officer Harrison (who, like the other officers, was in plain clothes) did not identify himself as a police officer when he got out of the unmarked Escalade and approached Rev. Ayers with his gun drawn; (4) Rev. Ayers tried to back away in reverse because he did not know that Officer Harrison was a law enforcement official, and reasonably believed that he was about to be robbed by unknown assailants; (5) Rev. Ayers did not try to strike or run over any of the officers when he backed up; (6) Officer Chance Oxner was out

---

[1] Officer Harrison attempts to muddy the waters by arguing that the operative facts in this case are as the district court supposed them to be in its order denying his motion for a new trial. As we will explain later, in ruling on that motion, the district court deemed that the jury answered all of Officer Harrison's proposed special interrogatories in his favor. Based on the district court's assumption, Officer Harrison urges us to abandon our normal standard of review and take the facts (or at least some of the critical facts) in his favor. We decline to do so for two reasons. First, it was the jury, and not the district court, that was the trier of fact in this case. Second, when reviewing a verdict for sufficiency of evidence, we resolve all conflicts in the evidence in favor of the verdict. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) ("[T]he drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. *The evidence of the non-movant is to be believed*, and all justifiable inferences are to be drawn in his favor.") (emphasis added; citation omitted). We therefore view the evidence in the light most favorable to Ms. Ayers.

of any danger when Officer Harrison shot Rev. Ayers; (7) Officer Harrison shot Rev. Ayers as he was retreating and driving away in reverse; and (8) the version of events presented by Officer Harrison was not credible, particularly given that Officer Harrison had previously lied about the shooting—for example, by falsely claiming that Rev. Ayers had driven towards him—right after the incident.[2]

Applying the Fourth Amendment's "'objective reasonableness' standard," *Graham v. Connor*, 490 U.S. 386, 388 (1989), which asks us to "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion," *Scott v. Harris*, 550 U.S. 372, 383 (2007) (internal quotation marks and citations omitted), we find ample support for the jury verdict. *See, e.g., Salvato v. Miley*, 790 F.3d 1286, 1290, 1293–94 (11th Cir. 2015) (summarizing Eleventh Circuit precedent and holding that the officer violated the Fourth Amendment rights of decedent—who was yelling at cars along the side of a road unarmed and without a shirt—when she shot him without a verbal warning after he retreated following a physical struggle with officers).

---

[2] The trial record includes video from a security camera at the convenience store, but that video—which we have viewed—is not dispositive as to the sequence of events culminating in the deadly shooting. First, the camera was not very close to Officer Harrison and Rev. Ayers. Second, the camera angle did not allow all relevant events to be captured on film. Third, the quality of the video is poor. So, unlike the situation in *Scott v. Harris*, 550 U.S. 372 (2007), the video does not contradict, much less "blatantly contradict[]," Ms. Ayers' version of events. *Id.* at 380. Even with the video, the jury still had to make numerous and critical factual findings, including some based on credibility choices.

The decisions cited by Officer Harrison do not call for a different conclusion, as in those cases, even when viewing the facts most favorable to the plaintiffs, it was clear that those who were subject to deadly force were well aware that they were dealing with police officers, disobeyed police commands, and posed a danger to either the officers or others.  *See, e.g., Terrell v. Smith*, 668 F.3d 1244, 1254 (11th Cir. 2012) (suspect, who was under arrest, ignored the uniformed officer's commands to stop the car and turned the vehicle "in a manner that caused it to strike the officer"); *Garcyznski v. Bradshaw*, 573 F.3d 1158, 1168 (11th Cir. 2009) (suspect failed to show his hands as ordered and instead swung his gun in the direction of the uniformed officers, who then fired); *Long v. Slaton*, 508 F.3d 576, 581–82 (11th Cir. 2007) (suspect who was mentally unstable evaded the officer's physical control, stole a police car, and refused to stop driving even after being warned of deadly force); *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005) (suspect ignored uniformed officer's command to put his hands up and suddenly drove his car toward the officer, who was standing in a narrow space between two cars and could have been crushed).  When the evidence is viewed in the light most favorable to Ms. Ayers, those scenarios are not present here.[3]

---

[3] Our recent decision, *Singletary v. Vargas*, 804 F.3d 1174 (11th Cir. 2015), is also unhelpful to Officer Harrison because in that case the undisputed video evidence established that the uniformed officer was in the path of the car when it accelerated toward him and when the officer responded with deadly force.  *See id.* at 1184.  In that case the driver of the vehicle also pled guilty to aggravated assault on a police officer based on driving his vehicle at the officer and

## II

In the alternative, Officer Harrison argues that he is entitled to qualified immunity for shooting Rev. Ayers.  He argues that, at the time of the incident, preexisting law had not clearly established that his actions were unconstitutional.

Officer Harrison correctly reminds us that broad propositions of law, such as the one announced in *Garner*, are, for the most part, insufficient to provide fair notice that a particular use of deadly force was unreasonable.  *See Terrell*, 668 F.3d at 1257.  We accept this principle, but, viewing the facts in the light most favorable to Ms. Ayers, *see Salvato*, 790 F.3d at 1293, we have little difficulty concluding that Rev. Ayers' right to be free from deadly force under these circumstances was clearly established prior to September 1, 2009.

"The purpose of qualified immunity is to allow officials to carry out discretionary duties without the chilling fear of personal liability or harrassive litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law."  *McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009) (internal quotation marks and citations omitted).  "Thus, a police officer is entitled to qualified immunity if a reasonable police officer could have believed his or her actions were lawful in light of clearly established law and

---

causing in the officer a fear that violence was about to take place.  *See id.* at 1179.  Here the facts, viewed in the light most favorable to Ms. Ayers, do not mirror those in *Vargas*.

the information possessed by the officer at the time the conduct occurred." *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000) (citation omitted).

To obtain qualified immunity, a government official must first establish that he was engaged in a discretionary act. *See Mercado v. City of Orlando*, 407 F.3d 1152, 1156 (11th Cir. 2005). If he does, the burden then shifts to the plaintiff to show that "qualified immunity is not appropriate by satisfying a two-part inquiry." *Id.* (citation omitted). First, the plaintiff must show that the officer violated a constitutional right. *See id*. Second, the plaintiff must demonstrate that this right was clearly established at the time of the incident. *See id.*[4]

"[A] plaintiff's citation of general rules or abstract rights is insufficient to strip a § 1983 defendant of his qualified immunity." *Jackson*, 206 F.3d at 1165 (citations omitted). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Salvato*, 790 F.3d at 1292 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

As far back as 1985, our en banc opinion in *Gilmere v. City of Atlanta, Georgia*, 774 F.2d 1495 (11th Cir. 1985) (en banc), made it clear that using deadly force against an unarmed, nondangerous suspect is unconstitutional. In *Gilmere*,

---

[4] We assume, without deciding, that Officer Harrison was engaged in a discretionary act even though, at the time of the shooting, he had not completed Georgia's required annual use of force training and had possibly lost his lawful authority to act as a law enforcement officer under state law.

an intoxicated suspect had a near-collision with a van, and then afterwards got into an argument with the van's driver. *See id.* at 1496. The driver called the police and reported that the suspect had threatened him with a gun. *See id.* Police officers arrived at the suspect's home and ordered him to their car for questioning. *See id*. at 1496–97. The suspect initially resisted by attempting to flee and flailing his arms, but was unsuccessful because of his drunken condition. *See id*. at 1497. The police officers seized the suspect by force, and, according to eyewitnesses, began "beating him about the head." *Id*. As they neared the patrol car, the suspect broke free and a scuffle ensued. *See id.*

Much like here, the parties in *Gilmere* presented conflicting evidence about what occurred in the moments before the shooting. The officers testified that the suspect broke away, grabbed one of the officer's guns, and began to level it at another officer when he was shot. *See id.* at 1497 n.1. Eyewitnesses, however, reported that they did not see the suspect with a weapon at any time. *See id.* The district court weighed the testimony and concluded that the facts were the following:

> [T]he officers were striking [the suspect] as he tried to break away. When he did break away, he reached for [Officer] Craig's revolver. In the ensuing scuffle, the revolver was knocked to the ground. At that point, [the suspect] lunged toward [Officer] Sampson, who reacted by drawing his own revolver and shooting [the suspect] twice at close range in the abdomen.

*Id.* Based on these facts, and despite the suspect's lunge, we concluded that "the police had little cause to believe [the suspect] himself to be dangerous." *Id.* at 1502. Due to the suspect's small size, intoxicated state, and lack of a weapon, we determined that he posed little threat to the officers. *See id.* As a result, we held that the officer violated the Fourth Amendment when he shot the suspect, who "did little to provoke the police officers to beat him. That unwarranted intrusion, as well as the unwarranted shooting which directly resulted from his efforts to escape the officers' further physical abuse, [gave] grounds for relief under the [F]ourth [A]mendment." *Id.*

Two years later, in *Lundgren v. McDaniel,* 814 F.2d 600 (11th Cir. 1987), we arrived at a similar conclusion. There, Margaret Lundgren filed a § 1983 suit against two deputies for shooting and killing her husband. *See id.* at 601. At trial, Ms. Lundgren testified that she and her husband decided to sleep behind a desk at their video store after the front window had been broken. *See id.* at 602. Later that night, she heard someone walking on the glass outside the store and awoke her husband. *See id.* As he stood up to investigate the noises, he was shot in the head. *See id.* According to Ms. Lundgren, her husband had barely stood up before he was shot. *See id.* After being pressed on the issue, however, she testified that it was possible that her husband may have fired a weapon. *See id.*

10

The deputies testified that around 2:00 am they noticed the broken window and believed a robbery was in progress. *See id.* They entered the dimly lit store without announcing themselves. *See id.* One of the officers testified that he saw a large figure rise up from behind a desk, saw a flash of light from a gun, and felt a blast of hot air on his forehead. *See id.* He returned fire. *See id.* After the shooting stopped, he stated that he went around the desk and saw Mr. Lundgren, lying on the floor with a gun nearby. *See id.* Forensic evidence showed that a bullet had struck Mr. Lundgren in the right temple after first passing through the desk. *See id.* Investigators did not find any physical evidence to support that either Mr. or Ms. Lundgren had fired a shot at the officers. *See id.* Based on these facts, we concluded that the use of deadly force was not justified because "the officers without provocation shot at a nondangerous suspect." *Id.* at 603.

Here Officer Harrison had even less cause than the officers in *Gilmere* and *Lundgren* to believe that Rev. Ayers presented an imminent risk of harm. First, Officer Harrison and his colleagues concededly had no probable cause to believe that Rev. Ayers was involved with drugs or was armed or dangerous. Second, *Gilmere* demonstrates that, even in cases where a suspect engages in a struggle, police officers are still required to properly assess whether the suspect is a *genuine* threat based on the information available to them at the time. Officer Harrison did no such thing. Without notice, Officer Harrison approached Rev. Ayers in an

11

unmarked SUV which partially blocked the path of Rev. Ayers' car. Officer

Harrison, who was not in uniform, then drew his weapon, without first identifying

himself as a law enforcement officer. Instead of evaluating whether Rev. Ayers

was a true threat—or was simply scared of being robbed—when he put his car in

reverse and backed up, Officer Harrison fired his weapon without warning or

provocation.

*Gilmere* and *Lundgren* provided Officer Harrison with sufficient notice that

his use of deadly force was unconstitutional. *See Holloman ex rel. Holloman v.

Harland*, 370 F.3d 1252, 1277 (11th Cir. 2004) ("A principle of constitutional law

can be 'clearly established' even if there are 'notable factual distinctions between

the precedents relied on and the cases then before the Court, so long as the prior

decisions gave reasonable warning that the conduct at issue violated constitutional

rights.'") (quoting *United States v. Lanier*, 520 U.S. 259, 269 (1997)). As we

explained recently, "the standard for excessive force is clearly established and our

precedents and those of the Supreme Court make [it] clear that firing without first

warning on a retreating, apparently unarmed suspect is excessive[.]" *Salvato*, 790

F.3d at 1294 (denying qualified immunity in a shooting that took place after a

suspect resisted arrest and struck the officers several times).[5]

---

[5] This is essentially why we denied qualified immunity to Officer Harrison on interlocutory appeal:

12

Given our resolution of this issue, we need not address Ms. Ayers' argument that Officer Harrison was not exercising a discretionary function because, due to his failure to complete certain use of force training required by Georgia law, he had lost his authority to use force as a police officer. *See* footnote 4.

## III

Officer Harrison argues that he is entitled to a new trial due to certain procedural and evidentiary rulings made by the district court. We are not persuaded.

We generally review the district court's denial of a motion for a new trial for abuse of discretion. *See Middlebrooks v. Hillcrest Foods, Inc*., 256 F.3d 1241, 1247 (11th Cir. 2001). The same standard applies to the district court's procedural and evidentiary rulings. *See id.* at 1248. "The abuse of discretion review requires us to 'affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard.'" *Rance v. Rocksolid Granit*

---

At the time Officer Harrison fired the fatal shot, under the facts most favorable to [Ms. Ayers], neither Officer Harrison nor anyone else present at the scene faced an immediate threat of harm from [Rev.] Ayers, and there was no indication that [Rev.] Ayers posed a danger to others if allowed to drive away. And [d]efendants concede that there was no probable cause to believe [Rev.] Ayers had committed a crime when Officer Harrison first approached [his] car with his gun drawn. Given these circumstances, we cannot say that Officer Harrison's use of deadly force was objectively reasonable, or that he was entitled to qualified immunity under federal law[.]

*Harrison*, 506 F. App'x at 884. Given the evidence presented at trial, Officer Harrison is not entitled to qualified immunity as a matter of law under Rule 50.

13

*USA, Inc.*, 583 F.3d 1284, 1286 (11th Cir. 2009) (quoting *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc)).

## A

During trial, Officer Harrison requested that the district court submit a number of special interrogatories to the jury, which were designed to elicit facts he believed were critical to his qualified immunity defense. Through these special interrogatories, Officer Harrison wanted to have the jury determine whether it believed that he identified himself to Rev. Ayers as a police officer, approached Rev. Ayers with his gun holstered, and only shot at Rev. Ayers once he began to drive towards him. The district court refused to submit the interrogatories to the jury, ruling that the questions were likely to cause confusion. The district court also found that the proposed interrogatories were irrelevant, and determined that, even if the jury answered all of the questions in Officer Harrison's favor, qualified immunity would still be inappropriate.[6]

---

[6] Officer Harrison propounded the following special interrogatories for submission to the jury:

1.  When Billy Shane Harrison first got out of the SUV, did he initially approach the front, driver's side of the car driven by Ayers?

2.  When Billy Shane Harrison got out of the SUV and stood next to Ayers' car, did Harrison have a Mountain Judicial NCIS badge (police badge) around his neck and hanging in front of his t-shirt?

3.  After Billy Shane Harrison got out of the SUV and stood next to Ayers' car, did Harrison extend his badge towards Ayers with his left hand?

After the jury returned its verdict, Officer Harrison renewed his objection to the district court's refusal to submit the special interrogatories through a motion for a new trial. He argued that, had the jury answered the interrogatories in his favor, the district court would be required to grant him qualified immunity because any Fourth Amendment violation under the circumstances would not have been clearly established. The district court denied the motion. On appeal, Officer Harrison argues that the district court committed error because, under *Johnson v. Breeden*, 280 F.3d 1308, 1318 (11th Cir. 2002), the decision to submit special interrogatories "is not discretionary with the court."

In *Johnson*, we reaffirmed the important role that special interrogatories serve at a trial like this one. Although the purpose of qualified immunity is to protect government officials from suit, there are times when a defendant's efforts

---

4. When Billy Shane Harrison got out of the SUV and stood next to Ayers' car, did Harrison have his firearm in a holster attached to his right side?

5. After Billy Shane Harrison got out of the SUV and stood next to Ayers' car, did Harrison pull his t-shirt up over his firearm with his right hand? Yes or No?

6. When Billy Shane Harrison got out of the SUV and stood next to Ayers' car, did Harrison have his firearm out and pointed at Ayers before Ayers began backing away?

7. When Jonathan Ayers backed his vehicle around the front of the SUV, did Billy Shane Harrison then follow the vehicle and see contact between the vehicle and Agent Chance Oxner?

8. At the moment Billy Shane Harrison made the decision to fire the shot that struck Jonathan Ayers, had Ayers' car begun to move in Billy Shane Harrison's direction?

15

to take advantage of the defense are unsuccessful at the motion to dismiss or summary judgment stages. *See id.* at 1317–18. In such cases, we emphasized that "a defendant is entitled to have any evidentiary disputes upon which the qualified immunity defense turns decided by the jury so that the court can apply the jury's factual determinations to the law and enter a post-trial decision on the defense." *Id.* at 1318. We explained that, in this regard, special interrogatories can be a helpful tool, and cautioned that the failure to grant "a timely request for jury interrogatories directed toward such factual issues" could constitute error. *Id.*

We also clarified, however, that the denial of such a request "may not be error, or if error may be harmless." *Id.* We held that reversible error would not occur if the jury verdict itself—when viewed in light of the jury instructions and any interrogatories that were answered by the jury—made the answers to the refused interrogatories irrelevant to the qualified immunity defense, or indicated without doubt what the answers to the refused interrogatories would have been. *See id.*

Officer Harrison argues that Ms. Ayers did not meet either of these exceptions. But the list in *Johnson* could not have been, and was not meant to be, exhaustive. And for several reasons, we conclude that the district court's failure to submit Officer Harrison's special interrogatories here was, at most, harmless error.

First, as we noted earlier, a prior panel of this court denied Officer Harrison qualified immunity at the summary judgment stage of the case.  *See Harrison*, 506 F. App'x. at 884.  And that panel's decision, on the facts presented at summary judgment, constitutes a legal ruling that is

> binding . . . and may not be revisited in later proceedings. Consequently, once we deny defendants summary judgment on qualified immunity grounds because the plaintiff has alleged violations of clearly established rights, the defendants *may not later attempt to re-assert qualified immunity against those claims on purely legal bases* (e.g. by arguing that the rights do not exist or are not clearly established).  The only remaining issues are questions of fact—i.e., whether the plaintiff can actually prove at trial that the alleged violations occurred.

*Holloman*, 370 F.3d at 1264 n.7 (emphasis added).  *See also Flint Elec. Membership Corp. v. Whitworth*, 68 F.3d 1309, 1312 (11th Cir. 1995) ("This court's prior decision that the DOC defendants were not entitled to qualified immunity from § 1983 damages is binding here as the law of the case unless (1) new and substantially different evidence material to the issue has been presented; (2) controlling authority has been rendered which is contrary to the law of the previous decision; or (3) the earlier ruling was clearly erroneous and would work a manifest injustice if implemented.") (citation omitted).

The prior panel based its denial of qualified immunity on the following basic facts (viewed in the light most favorable to Ms. Ayers): (1) despite conceding that he did not have probable cause to arrest Rev. Ayers, Officer Harrison (while

17

dressed in plain clothes) approached Rev. Ayers without identifying himself as a police officer and drew his weapon; (2) Rev. Ayers thought he was being robbed and attempted to drive out of the gas station, but Officer Harrison fired two shots at his car, one of which struck Rev. Ayers in the abdomen; and (3) at the time of the fatal shot, Rev. Ayers did not present an immediate threat of harm to Officer Harrison or anyone else at the scene. *See Harrison*, 506 F. App'x at 884. The trial record here, as explained above, shows that Ms. Ayers presented more than sufficient evidence to the jury to support each of the basic facts on which the prior panel denied qualified immunity on interlocutory appeal.

Second, as we have said, we are required to view the verdict in favor of Ms. Ayers as if the jury resolved "*every* relevant factual issue" in her favor and against Officer Harrison. *$242,484.00*, 389 F.3d at 1155 (emphasis added). So we must infer that the jury rejected Officer Harrison's factual contentions (e.g., that he approached the driver's side of Rev. Ayers' car, that he identified himself as a police officer to Rev. Ayers, that he did not approach Rev. Ayers with his gun drawn, and that he only fired his weapon after seeing Rev. Ayers' car strike Officer Oxner and then head in his direction).

In sum, because Ms. Ayers presented ample evidence that allowed the jury to find the facts on which the prior panel denied qualified immunity to Officer Harrison, and because we have to infer that the jury resolved every relevant factual

dispute in favor of Ms. Ayers, any error in failing to submit the special interrogatories to the jury in this case was harmless. *See Johnson*, 280 F.3d at 1318.

## B

Officer Harrison's remaining arguments for a new trial are all without merit.

First, the district court did not abuse its discretion in excluding Kayla Barrett's testimony that Rev. Ayers was one of her prostitution clients. Even if, as Officer Harrison suggests, Ms. Ayers "opened the door" to such testimony by arguing that Rev. Ayers had no reason to evade the police other than his fear of being robbed, the district court had wide discretion to exclude the evidence under Federal Rule of Evidence 403 if it believed the evidence was more prejudicial than probative. *See Breeden v. ABF Freight Sys., Inc.*, 115 F.3d 749, 754 (10th Cir. 1997) (holding that the trial court did not abuse its discretion in excluding evidence even after the trial court recognized that "the plaintiffs had opened the door to the relevance of such evidence[,]" because the trial court found that "the prejudicial effect of letting in [the] evidence . . . would far outweigh the probative value") (internal quotation marks omitted).

Second, Officer Harrison's argument that our precedent precluded Ms. Ayers from advancing an "officer created danger" theory at trial is both factually and legally incorrect. During trial, Ms. Ayers argued that Officer Harrison should

be held liable in part because he rapidly approached Rev. Ayers in an unmarked vehicle in plain clothes, jumped out of the vehicle with his gun drawn, and failed to identify himself.  She claimed, in part, that Officer Harrison's reckless conduct caused the risk that eventually led to the shooting.

Factually, the evidence Ms. Ayers presented to support this theory—evidence as to what happened in the moments before the shooting—was the same evidence Officer Harrison used to demonstrate that his use of deadly force was reasonable.  This is not a case, therefore, where a police officer in a § 1983 case was prejudiced through the introduction of evidence he sought to exclude on some evidentiary basis.

Legally, Officer Harrison did not object to the district court's jury instruction permitting the jury to consider—for purposes of determining if he reasonably believed that Rev. Ayers posed an immediate risk of harm—whether Officer Harrison's actions leading up to the shooting created the risk.  Therefore, he forfeited any such objection on appeal.  *See Badger v. S. Farm Bureau Life Ins. Co.*, 612 F.3d 1334, 1342 (11th Cir. 2010) ("In general, a party must object to a jury instruction prior to deliberations in order to preserve the issue on appeal, and the failure to make a timely objection waives the right to raise the issue on appeal.") (citation omitted).

Third, we reject the contention by Officer Harrison that the district court improperly permitted "use of force experts" to instruct the jury on whether he violated the Fourth Amendment. Testimony by such experts is generally admissible as long as the jury is properly informed that the expert is testifying only "regarding prevailing standards in the field of law enforcement." *Samples v. City of Atlanta*, 916 F.2d 1548, 1551 (11th Cir. 1990). That is exactly what happened here. The questions posed to the experts, and their answers, demonstrate that the experts were opining on prevailing law enforcement standards.

Fourth, if any error resulted from the admission of evidence concerning Officer Harrison's deficient training and lack of authority to detain Rev. Ayers, the error was harmless. A jury's verdict will not be set aside due to the erroneous admission of evidence unless it affects the substantial rights of the party asserting the error. *See. e.g., United States v. Gamory*, 635 F.3d 480, 492 (11th Cir. 2011) ("Where a [d]istrict [c]ourt abuses its discretion in admitting evidence, we may still find the error harmless. Non-constitutional error is harmless when it does not affect the substantial rights of the parties.") (internal citation omitted). Officer Harrison has failed to make such a showing, and is therefore not entitled to a new trial.[7]

---

[7] As for Officer Harrison's challenge to the district court's award of attorney's fees to Ms. Ayers for work on the interlocutory appeal, we find no abuse of discretion and affirm without further discussion.

## IV

Ms. Ayers, in her cross-appeal, challenges the reduction of the award for future lost earnings to present value.  She bases her argument on two grounds: (1) the district court improperly applied a discount rate to Rev. Ayers' full life expectancy as opposed to his work life expectancy; and (2) Officer Harrison urged the district court to commit an error of law by arguing that a Georgia statute mandated the application of a 5% discount rate for lost wages.  We reject both arguments.

## A

During trial, Ms. Ayers testified that Rev. Ayers was 28 years old when he died.  She also put into evidence Mr. Ayers' tax returns from 2005 through 2009, reflecting his annual income (which ranged from approximately $28,000 in 2005 to $19,000 in 2008), as well as a mortality table projecting that Rev. Ayers had 46.52 years of life ahead of him when he died.

At the close of the case, the district court instructed the jury that, if it found in Ms. Ayers' favor on her claim, it had to decide the issue of damages, including determining the full value of the life of Rev. Ayers "as shown by the evidence." D.E. 362-7 at 1408–09.  The jury was instructed that this determination was comprised of two elements—"[f]irst, the economic value of the deceased's normal

22

life expectancy," and, "second, an intangible element incapable of exact proof, which is measured only by the enlightened conscience of the jury." *Id.* at 1409.

The jury was told that the first element, the economic value of Rev. Ayers' life, was to be "based on the gross sum the deceased would have earned *to the end of his life* had he not been killed," and that "[t]he plaintiff must prove by a preponderance of the evidence the age of the deceased when he died, *his probable life expectancy*, and his yearly income or the value of his services." *Id.* (emphasis added). The district court noted that the mortality table was evidence the jury could consider to determine Rev. Ayers' life expectancy. "From all of this evidence," the jury was instructed, "you would then compute the gross cash value of the deceased's *remaining life expectancy*." *Id.* at 1410 (emphasis added). The verdict form required the jury to assign a specific value for the two elements comprising the full value of Rev. Ayers' life. The jury found the economic value of Rev. Ayers' life to be $1,264,765.

As agreed by the parties, the damages awarded for Rev. Ayers' future lost earnings were to be reduced to present value by the district court in post-trial proceedings. In these proceedings, the parties disagreed on whether the award for lost future earnings should be discounted based on Rev. Ayers' entire life expectancy (approximately 46.52 years beyond his age of death, according to the mortality table), as Officer Harrison proposed, or if it should be discounted based

on his work life expectancy (approximately 36 years beyond his age of death, assuming Rev. Ayers would work until age 65), as Ms. Ayers proposed.

The district court rejected Ms. Ayers' two-pronged argument that work life expectancy should be used because other cases used this approach and because "[m]ost people retire at age 65 and do not work every day of their life until the date of death." D.E. 328 at 2–3. Rather, in light of the jury instructions and the fact that the mortality table was the only evidence introduced at trial providing any certainty regarding how long Rev. Ayers could be expected to work, the district court concluded that the jury based its future lost earnings award on Rev. Ayers' entire life expectancy. Other than the work life expectancy versus entire life expectancy disagreement, Ms. Ayers had no objections to the "math calculations" or "to the math used" by Officer Harrison to discount the jury award to present value. D.E. 337 at 2. The district court therefore adopted Officer Harrison's calculations, which resulted in a reduction of the economic value award to $606,469.69.[8]

---

[8] Based on Rev. Ayers' exact age at death and the mortality table in evidence, Officer Harrison determined that Rev. Ayers could have expected to live (and earn income) for an additional 45.967 years. He divided the lost profit award that the jury reached ($1,264,765) by this period of life expectancy to arrive at an annual income of $27,514.66. Based on this annual income figure, Officer Harrison calculated a "past" income amount of $123,015.57, for the approximately 4.471 years that elapsed between Rev. Ayers' death and the jury verdict, for which there was no need to reduce the amount to present value. The remaining 41.496 years of Rev. Ayers' projected life constituted "future" income, which needed to be reduced to present value. For this, Officer Harrison used a formula provided by the Supreme Court in *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523 (1983).

24

Because the jury instructions clearly directed this result and Ms. Ayers did not object to those instructions, we conclude she has forfeited her right to challenge this issue on appeal. *See Badger*, 612 F.3d at 1342. The jury calculated Rev. Ayers' future lost wages award of $1,264,765 based on the gross sum he "would have earned to the end of his life" (which may have actually benefitted Ms. Ayers more than if the jurors had only calculated what he would earn up until 65 years of age). Having failed to object to this jury instruction, Ms. Ayers cannot now argue that the district court should use a lesser number of years to reduce that gross sum to its present value.

Moreover, although it may generally be appropriate to use work life expectancy to calculate future lost earnings, this method is not required. Rather, it depends on the trial record or the parties' agreement. In *Deakle v. John E. Graham & Sons*, 756 F.2d 821 (11th Cir. 1985), for example, a panel of this court noted that there was no record evidence establishing the number of years the plaintiff could have expected to work, and only a mortality table was introduced in evidence. *See*

---

*Pfiefer* explained that "[t]he arithmetic necessary for discounting can be simplified through the use of a so-called 'present value table[.]'" *Id.* at 537 n.21. "These tables are based on the proposition that if $i$ is the discount rate, then 'the present value of $1 due in $n$ periods must be $1/(1+i)^n$.' In this context, the relevant 'periods' are years; accordingly, if '$i$' is a market interest rate, it should be the effective *annual* yield." *Id.* (internal citations omitted).

Officer Harrison used a 5% discount rate for "$i$" and calculated the present value of the annual income for each of the remaining 41.496 years using a varying "$n$." He determined the present value of the future income totaled $483,454.12. The total past and future income, as calculated by Officer Harrison, and adopted by the district court, was $606,469.69. In comparison, Ms. Ayers' calculations based on work life expectancy resulted in a present value of $735,824.11.

25

*id.* at 832.  Based on that record, the panel concluded that the life expectancy approach, as opposed to the work life expectancy approach, should have been used. *See id.*  However, because the issue was not raised on appeal, the panel declined to alter the district court's conclusion that the jury presumed plaintiff would have retired at age 65.  *See id.  See also Hiatt v. United States*, 910 F.2d 737, 743 (11th Cir. 1990) (affirming district court's finding that plaintiff would have worked only until age 65 due to evidence in the record of his increasing interest in recreational activities and an expert economist's testimony based on work-life expectancy tables).  Indeed, in *Pfeifer*, the Supreme Court noted that "[g]iven the complexity of trying to make an exact calculation, litigants frequently follow the relatively simple course of assuming that the worker would have continued to work up until a specific date certain [sic]."  462 U.S. at 533–34.  In that case, both parties had agreed that the petitioner would have continued to work until age 65 if he had not been injured.  *See id.* at 534.

Ms. Ayers' argument that the jurors would have assumed that Rev. Ayers would have retired at age 65—because he might not have been permitted by his employer to work past that age and because retirement is often mandatory—is unpersuasive, as there is no evidence in the record indicating that a pastor must retire at age 65.  The only suggestion Rev. Ayers might have retired at 65 years of age was in a comment by counsel in closing argument: "If he worked 37 years

26

from 28 to age 65, how much is he going to make a year? . . . What's he going to make per year? Whatever you decide that is, multiply it times 37 years, that's the economic part of the wrongful death claim." D.E. 362-7 at 1343. But the argument of counsel is not evidence. "Having failed to perfect the record at trial, [Ms. Ayers] cannot complain on appeal that an error has been made." *Deakle*, 756 F.2d at 831.

**B**

Next, Ms. Ayers argues that Officer Harrison urged the district court to commit an error of law by arguing that a Georgia statute mandated the application of a 5% discount rate for future lost wages. She contends that the statute had recently been changed to permit the trier of fact to apply whatever rate it deemed appropriate, and challenges the district court's finding that the parties consented to the application of a 5% discount rate. This argument lacks merit.

At the charge conference, the parties presented arguments to the district court concerning the appropriate formula to apply to a lost wages award in order to reduce it to its present value. Officer Harrison questioned how the jury could apply a 5% discount rate given that no mathematical or other methodological evidence had been presented. Notably, Ms. Ayers did not raise any objection to the proposed 5% discount rate, and responded that the court could "instruct [the

jury] on the law on the 5-percent . . ." and "on the reduction which is part of the standard charge," and that "would be more than sufficient."

After trial, Ms. Ayers represented to the district court that she had no objections to "to the math used" by Officer Harrison in his post-verdict brief regarding present value calculations or his "math calculations," which used a 5% discount rate. Moreover, Ms. Ayers' own economic expert employed a discount rate of 5% to arrive at his proposed present value calculation. *See* D.E. 328-1. The first time Ms. Ayers raised an objection to the 5% discount rate was one month after judgment had been entered. Given the sequence of events, it was not clearly erroneous for the district court to find that the parties had consented to applying a 5% discount rate.

In sum, we affirm the district court's reduction of Ms. Ayers' future lost earnings award to present value. Ms. Ayers admitted to not having considered how to reduce the jury's verdict to its present cash value until after the verdict was rendered and she had hired an expert. *See* D.E. 328 at 2. "After the jury returns a verdict, it is too late to consider how the damages should have been calculated and proved. By then, the horse is out of the barn. Therefore, it would behoove future litigants when preparing for trial to study carefully the horizon of damages before heading off down the trail." *Deakle*, 756 F.2d at 834.

**V**

For the foregoing reasons, we affirm the district court's denial of Officer Harrison's Rule 50 motion as to liability and qualified immunity and motion for a new trial.  We also affirm the district court's award of attorney's fees to Ms. Ayers and reduction of Ms. Ayers' future loss income award.[9]

**AFFIRMED.**

---

[9] Ms. Ayers also cross-appealed the dismissal of her state law claims, but made her argument contingent on the resolution of her civil rights claim.  She explained that the issue would be moot, in view of the damages awarded, if we upheld the civil rights verdict.  We therefore do not address that portion of the cross-appeal.